[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12349

_____

D.C. Docket No. 0:16-cr-60054-WJZ-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID ROTHENBERG,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 8, 2019)

Before ED CARNES, Chief Judge, and ROSENBAUM and HULL, Circuit Judges.

HULL, Circuit Judge:

After his guilty plea to possession of child pornography, David Rothenberg

appeals from the district court's restitution order requiring him to pay a total of

$142,600 in restitution to nine victims depicted in the images of child pornography that he possessed. Section 2259 mandates that district courts order defendants "to pay the victim . . . the full amount of the victim's losses" as determined by the court. 18 U.S.C. § 2259. This case involves the question of how to calculate the amount of restitution a possessor of child pornography, like the defendant Rothenberg, must pay to a victim whose childhood sexual abuse appears in the pornographic images he possessed but did not create or distribute.

On appeal, Rothenberg argues that: (1) the district court's restitution order is flawed as to all of the victims because it failed to calculate and then disaggregate the victim's losses caused by the initial abuser, distributors, and other possessors from those caused by Rothenberg himself; and (2) as to eight of the victims, the restitution award is not supported by competent evidence. After review, and with the benefit of oral argument, we conclude that the district court was not required to calculate and disaggregate the victim's losses in the manner Rothenberg suggests and that reliable evidence supports the restitution awards as to eight victims, but not as to one victim. We thus affirm the restitution amounts as to eight victims and vacate and remand as to one victim.

## I. INDICTMENT AND GUILTY PLEA

Defendant Rothenberg used to be a lawyer, a fact he told an undercover officer in an internet chatroom called "daddaughtersex." Rothenberg also sent the

2

officer videos of child pornography and bragged that he was sexually exploiting a young girl at his house.  In 2016, local and federal law enforcement went to Rothenberg's house and rescued the young girl, who confirmed that Rothenberg had engaged in sexual activity with her.  The officers also found and seized Rothenberg's laptop, which contained approximately 1,000 unique video and picture files of child pornography.  Some of those images depicted prepubescent children under the age of 12, and some portrayed sadistic and masochistic conduct, such as the binding and gagging of minor children.

In 2016, a grand jury charged Rothenberg with: (1) four counts of distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2) & (b)(1) (Counts 1, 3, 4, and 5); (2) one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) & (b)(1) (Count 2); and (3) one count of possession of child pornography depicting a minor under the age of 12, in violation of 18 U.S.C. § 2252(a)(4)(B) & (b)(2) (Count 6).  Pursuant to a written plea agreement, Rothenberg pled guilty to the possession offense in Count 6, and the government agreed to dismiss the receipt and distribution charges in Counts 1 through 5.  The district court sentenced Rothenberg to 210 months' imprisonment.

On appeal, Rothenberg does not challenge his guilty plea or sentence. Rather, Rothenberg challenges only the district court's restitution order granting a total of $142,600 to nine victims, which consists of: (1) $10,000 to Sierra;

3

(2) $3,000 to Jane; (3) $5,000 to Pia; (4) $5,000 to Mya; (5) $20,000 to Sarah; (6) $9,000 to Vicky; (7) $23,000 to Amy; (8) $42,600 to Jenny; and (9) $25,000 to Casseaopeia.  We outline the thorough process the district court followed, the evidence submitted, and then the district court's findings and conclusions.

## II. RESTITUTION PROCEEDINGS

After sentencing, the district court considered restitution requests pursuant to 18 U.S.C. § 2259(a), which provides for mandatory restitution to child pornography victims.  Generally, the process worked as follows.  First, the government identified the individual victims depicted in the images of child pornography found on Rothenberg's computer and notified them or their attorneys of the upcoming restitution hearing.  Then a victim's attorney submitted a restitution request and supporting documentation to the government.  Next, the government determined whether to support that request or ask the district court for a different amount.  Rothenberg could agree to the request, try to negotiate down with the government or the victim's attorney, or challenge the request before the district court.

Eventually the government submitted restitution requests on behalf of ten victims, all of whom were identified in at least one of the images of child pornography from Rothenberg's computer.  One of the victims, "Angela," later withdrew her request, leaving nine requests at issue for the hearing.

## A.    Pre-Hearing Memoranda

Prior to the restitution hearing, both parties submitted lengthy memoranda addressing (1) how the restitution determination should be made, and (2) what the award should be for each victim.  The government and Rothenberg agreed that the Supreme Court's decision in Paroline v. United States, 572 U.S. 434, 134 S. Ct. 1710 (2014), governed how the restitution awards should be made, established a proximate cause requirement, and set forth a variety of factors for district courts to consider in determining the proper amount of restitution.  Under Paroline's proximate causation requirement, a defendant should pay restitution "in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."  Paroline, 572 U.S. at 458, 134 S. Ct. at 1727.

But the parties disagreed about how exactly to apply the Paroline factors and how to calculate and determine that amount.  The government recognized that, under Paroline, the district court must impose restitution in an amount that reflects the particular defendant's relative role in the continuing traffic in the child pornography images of the victim.  The government proposed that the district court make that calculation by using a variation of what is known as the "1/n method," whereby the court would divide the total amount of each victim's losses by the number of defendants, across multiple prosecutions, who had been ordered to pay restitution to the victim.  The government submitted that this method would

5

provide the district court a starting point from which to exercise its discretion in determining the appropriate amount of restitution vis-à-vis Rothenberg, as only a possessor of images of child pornography.

Rothenberg argued, by contrast, that the starting point should be "apportionment between the original abuser of the child, versus the distributor, and later, possessor of the pornography," which Rothenberg referred to as "disaggregation." Rothenberg asserted that this disaggregation requires two steps: first, the district court must separate the harm caused by the original abuser from that caused by later distributors and possessors; and second, the district court must separate the harm caused by the defendant from that caused by other distributors or possessors.

Below, we detail for each victim (1) the victim's restitution request and supporting evidence, (2) the government's position, and then (3) Rothenberg's position.

## B.    Sierra

Sierra submitted a restitution request for $10,000. In support of her request, Sierra submitted a medical letter from Dr. Sharon W. Cooper, a forensic pediatrician, based on her December 2015 evaluation of Sierra. Dr. Cooper explained that victims of child pornography can experience physical, emotional, and spiritual issues as a result of their online exploitation, including immunological

6

problems, posttraumatic stress disorder ("PTSD"), anxiety, depression, suicidal ideation, and feelings of hopelessness.  Dr. Cooper noted that "[w]hen images are known to be in distribution, the pre-existing dysfunction caused by the initial abuse is typically worsened, since children remain at risk for further victimization by the ongoing downloading, trading and possession of their images."

With respect to Sierra specifically, Dr. Cooper stated that Sierra's medical evaluation showed she suffered from worsening insomnia, attention deficit hyperactivity disorder ("ADHD"), depression, suicidal ideation, PTSD, and mood lability.  Dr. Cooper noted that, despite being on five different medications, Sierra's condition remained unstable and she recently required emergency treatment for suicidality.  Dr. Cooper opined that "[t]he ongoing presence of trafficking in images [of Sierra] on the Internet constitutes a significant aspect of psychological maltreatment that will add on to the initial adversities" caused by the original abuse.  Based on Sierra's past medical history, the documented adversities faced by victims of child sexual abuse and child pornography offenses, and Sierra's present medical symptoms, Dr. Cooper estimated a total cost of $661,453.00 for Sierra's future medical care.

Sierra's counsel also submitted a declaration of attorney's fees, indicating Sierra had incurred nearly $5,000 in attorney's fees in connection with this case.

7

The government supported Sierra's $10,000 restitution request. The government observed that four other defendants had been ordered to pay restitution to victims in the same series of images as Sierra. Those awards were for $4,000, $1,000, $9,000, and $2,000.

Rothenberg opposed Sierra's restitution request. Rothenberg noted that he possessed only one image of Sierra[1] and that the requested restitution amount was more than double the average of Sierra's prior awards ($4,000). Rothenberg argued that Sierra's restitution materials made no attempt at disaggregation and that the government provided no information to demonstrate the relative amount of Sierra's harm caused by his conduct.

## C.    Jane

Jane submitted a restitution request for $3,000. In support of her request, Jane submitted a victim impact statement, a psychological report, and an economic report. In her victim impact statement, Jane specifically described how the online trade in her child pornography images had affected and would continue to affect her. Jane explained: "Knowing people are watching what happened gives me a mix of anxiety, sadness, anger and it disgusts me. . . . If it wasn't out there, I wouldn't be as fearful as I am now." Jane elaborated that the circulation of her

---

[1]Throughout we refer to how many images of a victim Rothenberg had. Each of the images recounted in this case were child pornography, and for brevity sometimes we refer to them simply as "images."

images made her feel afraid and unsafe because she worried that someone who had seen her images online might recognize her and try to harm her. Jane felt that her future would not be "very bright" and would be lonely because the existence of her images online made her socially isolated.

Jane's psychological evaluation was performed by Dr. Jennifer Clark in December 2014 "to determine the psychological effects of her continuous re-victimization in the form of Internet pornographic images and videos of her being exchanged and viewed." Dr. Clark opined that the online trade in Jane's images was currently impacting her, causing her great fear and anxiety and leaving her feeling unsafe and vulnerable. Dr. Clark observed that the trade in Jane's images would continue to impact her in the future by exacerbating her "deep sense of mistrust in others" from the original abuse and hindering her healing and recovery process. Dr. Clark explained: "[Jane's] awareness of the ongoing presence and distribution of [her] images will remain an ever present trigger to memories of what happened and a source of fear for her safety, and thus, ongoing psychological distress. Therefore, Jane will require therapy throughout her life. . . . Given that much of Jane's distress manifests in somatic symptoms and physiological distress, she likely will also seek and need significant medical attention in the future."

Jane's economic evaluation estimated that she would have future medical and therapy costs of $101,027, and lost wages of between approximately $1.9 and $3.9 million.

The government agreed that Jane's $3,000 restitution request was appropriate. The government noted that seven other defendants had been ordered to pay restitution to Jane. Three of those seven defendants were ordered to pay $1,000, two were ordered to pay $2,500, one was ordered to pay $3,000, and one was ordered to pay $500.

Rothenberg disputed Jane's requested amount and argued that a restitution amount of $800 would be appropriate. Rothenberg noted that he possessed four images of Jane and that the average award to Jane from the prior cases was $1,642. Rothenberg acknowledged that Jane's restitution materials were "the best of all provided to attempt disaggregation," but argued his possession did not warrant a $3,000 award when compared with other defendants. Specifically, Rothenberg noted that one of the prior cases with a $1,000 restitution order involved distribution, and three of the other cases involved receipt of Jane's images.

**D.     Pia**

Pia submitted a restitution request for $5,000. In support of her request, Pia submitted an interim impact statement from Dr. Marsha Hedrick, who conducted a forensic psychological evaluation of Pia, a declaration of attorney's fees, and a

10

victim impact statement from Pia's mother.  Dr. Hedrick noted that Pia experienced anxiety, nightmares, suspiciousness, and sadness and was emotionally withdrawn.  Dr. Hedrick explained that "[s]eparating the extent to which these difficulties are related to sexual abuse by her father versus her awareness that her sexual abuse is being viewed by others is not entirely possible," but it was clear internet exploitation adds a layer of complexity to the psychological damages victims of child sexual abuse face.  Indeed, Dr. Hedrick noted that Pia's mother had explained to Pia there was no way to remove from the internet the images of her sexual abuse, resulting in "a level of suspiciousness and concern about exploitation that is atypical for Pia's peers" and likely caused Pia to experience feelings of powerlessness.  Dr. Hedrick estimated the cost of Pia's therapy needs as $81,900, but explained that estimate reflected only the "current, most critical needs" for Pia and there was no way to know what the full extent of her losses would be over the course of her lifetime.

The government concurred in Pia's $5,000 restitution request.  The government did not have information on any other defendants that were ordered to pay restitution to Pia, but Pia's counsel advised one other defendant was ordered to pay restitution.

Rothenberg disputed Pia's requested amount and instead proposed a restitution award of $1,100.  Rothenberg contended there was "no real attempt at

11

disaggregation" in Pia's restitution documents, but agreed some amount of restitution was appropriate based on the number of images (14) he possessed of Pia. Rothenberg reasoned that $1,100 was appropriate because the government had requested $2,000 in restitution for Jenny (discussed below), and he possessed half as many images of Pia as he had of Jenny.

**E.    Mya**

Mya submitted a restitution request of $5,000. In support of her request, Mya's counsel submitted a restitution cover letter and declarations from both of her attorneys. Mya's counsel represented that they were still awaiting the results of Mya's psychological evaluation, but that other similarly situated child pornography victims they had represented had psychological treatment costs exceeding $100,000. Mya's counsel stated that Mya was aware of the existence of her images on the internet and "the knowledge that others have witnessed and even enjoyed [her] abuse is extremely upsetting to [her]." Counsel further represented that Mya was distrustful of other people and was at risk of being stalked or victimized by individuals who had seen her images online. Counsel also represented that they had expended $2,077.44 thus far in representing Mya and two other victims in the same series (one of whom was victim Pia, discussed above), and anticipated total legal costs of $30,000 for those three victims.

12

The government did not concur in Mya's $5,000 restitution request.  The government noted that there was no information on whether other defendants were ordered to pay restitution to Mya and determined that "[g]iven that [Rothenberg] possessed a single image of Mya and the future medical costs have not yet been established," a restitution award of $500 was appropriate.  The government stated that amount was neither trivial nor too severe.

Rothenberg argued there was no sufficient basis for awarding any restitution to Mya given the lack of information regarding her future medical costs.  Rothenberg also noted that he made an offer to Mya's counsel to pay the $500 amount the government sought, but that offer was rejected.

## F.     Sarah

Sarah submitted a restitution request of $25,000.  In support of her request, Sarah submitted, among other things, a cover letter, a victim impact statement, a 2014 psychological evaluation by Dr. Randall Green, and an economic report.  In the cover letter, Sarah's counsel represented that her requested restitution amount of $25,000 would be "less than 1%" of her total losses and that 327 other defendants were ordered to pay restitution to Sarah.

In her victim impact statement, Sarah explained that she worried that people who had seen her images online would "come after" her and try to victimize her in the same way her original abuser had.  Sarah elaborated: "Every time someone else

13

sees pictures or videos of me it feels like they are the ones who hurt me to begin with. . . . It is like I am just here for other people's pleasure and am not a person myself with my own wants and needs." Sarah stated that her fear prevented her from leaving the house by herself and from engaging in other normal activities like going to school, having a job, or socializing with more than a few people.

In his psychological evaluation, Dr. Green assessed "the impact and injuries caused by the discovery and daily awareness that multiple individuals are viewing images of sexual crimes being perpetrated against [Sarah] as a child." As part of his assessment, Dr. Green interviewed Sarah and also performed various psychological tests. Based on these sources of information, Dr. Green opined that "the discovery of multiple downloaders and distributors of her images effectively exponentially multiplied in [Sarah's] mind the number of sick and dangerous males 'out there' who might . . . do her harm." Dr. Green explained that Sarah's knowledge of the dissemination of her child pornography images online caused her daily psychological damage in the form of fear "that has reached a paranoid-like level of intensity." Dr. Green determined that Sarah required "extensive and intensive therapy" for the trauma caused by both the original abuse and the continuing traffic in her images. Dr. Green estimated the costs of Sarah's future psychiatric care were between $265,710 and $303,150.

Sarah's counsel reported that Sarah had incurred $31,433.77 in attorney's fees. The economic assessment for Sarah estimated a minimum of approximately $1.9 million in lost wages over her lifetime.

The government did not concur in Sarah's $25,000 restitution request and instead requested an award of $7,895 based on its 1/n calculation method. The government also provided a list of 155 prior restitution awards to Sarah, which ranged from $0 at the low end to $51,500 at the high end.

Rothenberg opposed Sarah's restitution request. Rothenberg cited three other cases involving Sarah in which the government presented the same restitution evidence and the courts found the government failed to establish proximate cause. Rothenberg argued that the government provided no evidence to disaggregate the harm proximately caused by his possession of six images of Sarah from that caused by the other defendants in the list it had provided.

## G.    Vicky

Vicky submitted a restitution request of $10,000. In support of her request, Vicky submitted several victim impact statements, several psychological reports from Dr. Green, an economic report, and a statement of attorney's fees. In her victim impact statements, Vicky described the effects of the ongoing distribution of the images of her sexual abuse as a child, including feelings of fear and paranoia, nightmares, and panic attacks. In a 2014 psychological status report,

Dr. Green opined that Vicky continued to require therapy as a result of the continuing traffic in her images, as well as her discovery of attempts by some viewers of her images to invade her privacy. Dr. Green explained that Vicky continued to experience anxiety, dissociative responses, social withdrawal, anger, feelings of powerlessness, and sleep disruption. Dr. Green estimated Vicky's total therapy costs to be between $108,975 to $113,600.

The economic report estimated Vicky's net lost wages over the course of her lifetime to be $828,150. Vicky's counsel represented that Vicky had incurred attorney's fees and costs of $92,371.96.

The government did not concur in Vicky's $10,000 request and instead requested an award of $1,283 using its 1/n method. The government provided a list of 659 other restitution awards to Vicky, which ranged from approximately $24 at the low end to $1 million at the high end.

Rothenberg opposed Vicky's restitution request for the same reasons he opposed Sarah's request, noting that other courts had denied restitution requests based on the same evidence and that the government failed to disaggregate. Rothenberg also noted that he possessed only one image of Vicky and that the average post-Paroline restitution award to Vicky was $3,632.

16

## H.    Amy

Amy submitted a restitution request of $25,000.  In support of her request, Amy provided a victim impact statement, several psychological evaluations from Dr. Joyanna Silberg, and an economic report.  In her victim impact statement, Amy stated that she "live[s] in constant fear that someone will see [her] pictures and recognize [her]."  Amy expressed feelings of powerlessness related to the traffic in the images of her sexual abuse as a child because "the crime has never really stopped and will never really stop."  Amy explained that she experienced fear, shame, and humiliation at the thought of her friends and other people she encounters discovering her images online.

In a December 2014 report, Dr. Silberg opined that although Amy had made strides as a result of an intensive treatment plan initiated in 2012, ongoing issues related to PTSD remained.  Dr. Silberg explained that Amy continued to experience flashbacks and nightmares, as well as "fear about the internet and shame associated with the ongoing viewing of her picture."  Dr. Silberg concluded that Amy "continues to suffer from the ongoing effects of her victimization from child abuse and from the continued use of her image by child pornography traders, viewers, and abusers," and recommended continued psychological treatment and monitoring.  Amy's economic report estimated her net lost wages as $2,855,173, and her future counseling costs as $512,681.

17

The government did not concur in Amy's $25,000 request and instead requested a restitution amount of $15,664 using its 1/n method.  The government provided a list of 215 other restitution awards to Amy, ranging from $50 at the low end to $3.5 million at the high end.

Rothenberg opposed Amy's restitution request.  Rothenberg noted that he possessed only one image of Amy and that the average post-Paroline restitution award to her was $3,891.  Rothenberg asserted that the government's list of prior restitution orders was inaccurate as to some of the awards and argued that the government made no attempt to disaggregate his conduct from that of other defendants.

## I.    Jenny

Jenny submitted a restitution request of $42,600.  In support of her request, Jenny submitted a victim impact statement and a cover letter from her counsel.  In her victim impact statement, Jenny stated that she worried about the images of her sexual abuse that were "out there" and feared being recognized in public.  Jenny expressed a strong desire to forget the abuse she had suffered but explained that "[w]ith the pictures still out there I can't."

In their cover letter, Jenny's counsel represented that this was Jenny's seventh restitution request.  Counsel stated that they were still in the process of obtaining expert reports for Jenny, but asserted that "such formal reports" were not

18

necessary for the district court to determine restitution. Counsel discussed a proposed bill which would set a $25,000 minimum restitution award for child pornography possession offenses, and represented that Jenny had costs of $5,100 for legal and attorney's fees and $12,500 for the preparation of expert reports. Because these three items totaled $42,600, Jenny's counsel contended that $42,600 amount was the appropriate restitution amount for Jenny.

The government did not concur in Jenny's $42,600 restitution request and instead requested a restitution award of $2,000. The government emphasized that Rothenberg possessed 34 images and one video of Jenny but noted the lack of documentation to support Jenny's restitution request. The government pointed out that one other defendant was ordered to pay restitution to Jenny in the amount of $7,500.

Rothenberg likewise noted the lack of evidence supporting Jenny's $42,600 restitution request. Nevertheless, based on the number of images of Jenny he possessed, Rothenberg agreed that the government's requested amount of $2,000 was reasonable.

## J.    Casseaopeia

Casseaopeia submitted a restitution request of $25,000. In support of her request, Casseaopeia provided a victim impact statement, a psychological report from Dr. Joyce Vesper, and an economic assessment. In her victim impact

19

statement, Casseaopeia described her ongoing victimization as a result of the online trade in her child pornography images. Casseaopeia stated that she worried the people viewing her images would seek her out and harm her. She explained that she suffers from anxiety, which makes it hard for her to work or go out in public, and experiences panic attacks when she thinks someone recognizes her from the internet. Casseaopeia further explained that the continuing traffic in her images made recovery from her PTSD and depression more difficult and "prevent[ed] the wound from healing."

In her September 2015 psychological report, Dr. Vesper described her clinical interview with Casseaopeia and the psychological tests she administered. From these assessments, Dr. Vesper concluded that Casseaopeia was "tortured by constant memories of childhood sexual abuse" and experienced "constant head chatter, graphic flashbacks, [and] panic attacks that are so overwhelming they feel like heart attacks." Dr. Vesper described Casseaopeia as living "in constant fear that the people viewing the pornographic films and pictures of her" online would capture her and subject her to the same abuse all over again. Dr. Vesper opined that "[w]ithout the appropriate psychotherapy to address [her] dissociation, depersonalization, derealization, amnesia, anxiety and depression," Casseaopeia would continue to experience flashbacks, nightmares, and depression. Dr. Vesper recommended intensive psychotherapy for Casseaopeia. In a supplemental report,

20

Dr. Vesper specifically addressed the effects on Casseaopeia of the ongoing traffic in her images. Dr. Vesper explained that Casseaopeia experienced persistent anxiety that people she knows will see on the internet images of her sexual abuse as a child and that this anxiety affects her recovery process.

The economic assessment estimated Casseaopeia had economic damages totaling $1,078,159, including $748,438 in lost earning capacity and $329,721 in future medical expenses.

The government requested a slightly lower restitution award of $21,563 for Casseaopeia, which was calculated using the 1/n method. The government noted that 49 other defendants were ordered to pay restitution to Casseaopeia and submitted a list of those prior awards. Those prior awards ranged from $0 at the low end to $50,000 at the high end.

Rothenberg opposed Casseaopeia's restitution request. Rothenberg noted that he possessed only two images of Casseaopeia and that the average restitution award to her was $3,974. Rothenberg argued that, like many of the other requests, the government did not differentiate between the harm he caused and that caused by other perpetrators. Rothenberg contended that Dr. Vesper's report primarily dealt with effects of the original abuse rather than the traffic in Casseaopeia's images.

21

**K.      Restitution Hearing**

On November 18, 2016, the district court held a restitution hearing.  At the restitution hearing, the government submitted the evidence on which its restitution requests were based, all of which was admitted into evidence.[2]  That evidence consisted of 891 pages of exhibits submitted by the victims and charts prepared by the government listing each victim's prior restitution awards in other federal cases.  The exhibits included the declarations, psychological evaluations, letters, and other evidence referenced in the government's restitution requests.  Rothenberg noted, at the outset of the hearing, that he agreed with the government's requested award of $2,000 to Jenny and therefore did not offer any argument as to that award.  The remaining requests were disputed, and the parties essentially reiterated the arguments raised in their prior memoranda as to those victims.

### III. COURT'S RESTITUTION ORDER

Six months later, on May 9, 2017, the district court issued its restitution order.  After outlining in detail Paroline's framework (and expressing some frustration with its inexactitude), the district court analyzed each victim's restitution request.  As a preliminary matter, the district court stated that, with

---

[2]Though the district court admitted the restitution exhibits into evidence at the restitution hearing, it did not scan and file those exhibits on the district court docket.  On appeal, Rothenberg filed an unopposed motion to supplement the record to include those exhibits, which this Court granted.

respect to each victim, it had assigned restitution in a manner that comported with

Rothenberg's relative role and only for damages he proximately caused. The

district court explicitly explained that it had not "attempted to hold [Rothenberg]

responsible for all losses sustained by any victim." Furthermore, the district court

expressly noted there was no evidence that Rothenberg was connected to the initial

abuse of any of the victims or that he had reproduced or distributed their images.

Instead, Rothenberg was a possessor only. And the district court specifically stated

that it had "taken these factors into consideration in assigning [Rothenberg] a

relative role as the proximate cause of these victims' losses."

Turning to the specific awards, the district court determined that Sierra's

$10,000 request was reasonable. The district court found that: (1) Rothenberg

possessed one image of Sierra; (2) a small number of criminal defendants had paid

restitution to Sierra; (3) Sierra's current mental health condition was severe; and

(4) Sierra's projected costs of care exceeded $600,000. The district court found "in

consideration of her large amount of total costs, the small number of contributing

offenders, and a request for a proportion of these costs proximately caused and to

be paid by [Rothenberg], who neither created nor distributed her image, that

$10,000 is a reasonable request under the Paroline analysis and factors."

Next, the district court determined that Jane's $3,000 request was

reasonable. The district court found that: (1) Rothenberg possessed four images of

23

Jane; (2) a small number of criminal defendants had paid restitution to Jane;

(3) Jane's victim impact statement specifically addressed how the existence of her images on the internet affected her and isolated the harm caused by possessors and distributors from that caused by the original abuse; and (4) Jane's estimated medical and therapy costs were $101,027. The district court found "in consideration of her medical costs, the small number of contributing offenders, and a request for a proportion of these costs to be paid by [Rothenberg], who neither created nor distributed her images, that $3,000 is a reasonable request under the Paroline analysis and factors."

The district court then determined that Pia's $5,000 request was reasonable. The district court found that: (1) Rothenberg possessed 14 images of Pia; (2) there was no evidence regarding the number of other criminal defendants ordered to pay restitution to Pia, though Pia's counsel indicated that one other defendant was so ordered; and (3) Pia's estimated therapy costs over the next 20 years totaled $81,900. The district court found "in consideration of her total costs, the fact that she has only received restitution from one other defendant, the large number of images possessed by [Rothenberg] of [Pia], and a request for a proportion of these costs to be paid by [Rothenberg], who neither created nor distributed her images, that $5,000 is a reasonable request under the Paroline analysis and factors."

24

The district court also determined that Mya's $5,000 request was reasonable, despite the government's requested amount of only $500. The district court found that: (1) Rothenberg possessed one image of Mya; (2) there was no indication as to whether any other criminal defendants were ordered to pay restitution to Mya; and (3) Mya's counsel indicated a reasonable treatment estimate for Mya would be more than $100,000. The district court found "in consideration of her total costs, the fact that she has not received any restitution at this time, and a request for a proportion of these costs to be paid by [Rothenberg], who neither created nor distributed her images, that $5,000 is a reasonable request under the Paroline analysis and factors."

As to Sarah, the district court determined that an award of $20,000—$5,000 less than Sarah's requested amount—was reasonable. The district court explained that: (1) Rothenberg possessed six images of Sarah; (2) over 150 criminal defendants were ordered to pay restitution to Sarah; (3) Sarah's victim impact statement explicitly addressed how the existence of her images on the internet affected her, thereby isolating the harm caused by possession of her images from that caused by the original abuse; and (4) Sarah's estimated cost of psychiatric care was nearly $300,000. The district court found, "in consideration of the amount of costs, the fact that many other offenders have been required to pay restitution to [Sarah]—which in the case of Sarah, the Court finds contributes to a finding that

25

the request is reasonable and acknowledged by many other courts—the large number of images possessed of [Sarah], and a request for a proportion of these costs proximately caused and to be paid by [Rothenberg], who neither created nor distributed her image[s], that $20,000 is an appropriate amount under the Paroline analysis and factors."

In a similar vein, the district court determined that for Vicky, $9,000—$1,000 less than Vicky's requested $10,000 amount—was a reasonable award. The district court found that: (1) Rothenberg possessed one image of Vicky; (2) more than 600, and possibly more than 800, other criminal defendants were ordered to pay restitution to Vicky; (3) Vicky's victim impact statement specifically addressed how the online traffic in her images affected her and explained the distinct harm caused by possessors and distributors of her images; and (4) Vicky's predicted therapy costs exceeded $100,000.  The district court found "in consideration of the amount of costs, the fact that many other offenders have been required to pay restitution to [Vicky]—which in the case of Vicky, the Court finds contributes to a finding that the request is reasonable and acknowledged by many other courts—and a request for a proportion of these costs proximately caused and to be paid by [Rothenberg], who neither created nor distributed her image, that $9,000 is an appropriate amount under the Paroline analysis and factors."

26

The district court likewise awarded a reduced amount to Amy.  The district court noted that Amy requested $25,000 and that the government requested $15,664, but the district court ultimately determined that $23,000 was reasonable. The district court explained that: (1) Rothenberg possessed one image of Amy; (2) more than 200 criminal defendants had paid restitution to Amy; (3) Amy's victim impact statement "provide[d] strong support for the different and separate harm that possessors proximately cause to victims such as [herself]"; and (4) Amy's counseling and therapy costs could exceed $500,000.  The district court found "in consideration of the large amount of costs, the fact that other offenders have been required to pay restitution to [Amy]—which, again, in the case of Amy, the Court finds contributes to a finding that the request is reasonable and acknowledged by other courts—and a request for a proportion of these costs proximately caused and to be paid by [Rothenberg], who neither created nor distributed her image, that $23,000 is an appropriate amount under the Paroline analysis and factors."

Regarding Jenny, the district court acknowledged that both the government and Rothenberg agreed that $2,000 was an appropriate amount, but that Jenny requested $42,600.  The district court determined that Jenny's requested amount was reasonable.  The district court emphasized that (1) Rothenberg possessed 34 images and one video of Jenny, and (2) only one other defendant had paid

27

restitution to Jenny.  The district court conceded there was "less documentation of Jenny's psychological and medical expenses as compared with some other victims in this case," but found that the $2,000 amount requested by the parties was insufficient.  Considering "the extremely large number of images [Rothenberg] possessed of [Jenny], her costs, the fact that only one other defendant has so far contributed to these costs, and a request for a proportion of these costs to be paid by [Rothenberg], who neither created nor distributed her images, the Court finds that $42,600 is a reasonable request under the Paroline analysis and factors."

Lastly, as to Casseaopeia, the district court determined that her requested award of $25,000 was reasonable, even though the government requested only $21,563.  The district court found that: (1) Rothenberg possessed two images of Casseaopeia; (2) more than 50 criminal defendants were ordered to pay her restitution; and (3) her projected costs of care exceeded $300,000.  Considering "her costs, the number of contributing offenders, and a request for a proportion of these costs proximately caused and to be paid by [Rothenberg], who neither created nor distributed her image," the district court found that "$25,000 is a reasonable request under the Paroline analysis and factors."

In total, the district court ordered Rothenberg to pay $142,600 in restitution, to be apportioned to the nine victims in the amounts set out above.  On appeal, Rothenberg argues that the district court erred as to all nine restitution awards.  We

28

begin with the restitution statute and then review the Supreme Court's <u>Paroline</u>

decision, which both parties agree governs this appeal.

## IV. 18 U.S.C. § 2259

Congress has mandated that district courts award restitution to victims of

certain federal crimes, including child pornography possession.  <u>See</u> 18 U.S.C.

§ 2259(a) (2012).[3]  The possessor of child pornography must pay restitution to the

victim whose childhood abuse appears in the pornographic materials he possessed.

<u>See</u> <u>id.</u> § 2259(b)(1), (c)(4).  The statute requires that "[t]he order of restitution . . .

shall direct the defendant to pay the victim . . . the full amount of the victim's

losses as determined by the court."  <u>Id.</u> § 2259(b)(1).  The statute defines the term

"full amount of the victim's losses" to include any costs incurred by the victim for:

> (A) medical services relating to physical, psychiatric, or psychological
>     care;
> (B) physical and occupational therapy or rehabilitation;
> (C) necessary transportation, temporary housing, and child care
>     expenses;
> (D) lost income;
> (E) attorneys' fees, as well as other costs incurred; and
> (F) any other losses suffered by the victim as <u>a proximate result of the</u>
>     <u>offense</u>.

---

[3]Since Rothenberg's guilty plea and restitution hearing, Congress amended 18 U.S.C.
§ 2259, effective December 7, 2018.  <u>See</u> Amy, Vicky, and Andy Child Pornography Victim
Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018).  All citations in this opinion
are to the previous version of 18 U.S.C. § 2259, which was in effect both when <u>Paroline</u> was
decided and at the time of the district court's restitution order in this case.

Id. § 2259(b)(3) (emphasis added). The statute defines a victim as "the individual harmed as a result of the commission of a crime under this chapter." Id. § 2255(c)(4) (emphasis added). A court may not decline to issue restitution because of the economic circumstances of the defendant or because the victim has received compensation from another source. See id. § 2259(b)(4)(B).

"The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." Id. §§ 3664(e), 2259(b)(2) (emphasis added). In Paroline, the Supreme Court addressed the meaning of "as a result of" and "proximate result" in § 2259 and precisely what type of causal connection or proximate cause must exist between the victim's losses and the defendant's offense. We review Paroline next.

## V. SUPREME COURT'S PAROLINE DECISION

Like this case, Paroline involved a possessor of child pornography images in wide circulation on the internet. In Paroline, the defendant was a possessor and not a distributor or the initial abuser. See 572 U.S. at 439, 134 S. Ct. at 1716. The Supreme Court grappled with the question of what causal relationship must be established between a defendant possessor's conduct and a victim's losses for purposes of determining the right to, and the amount of, restitution under § 2259. Id. As a preliminary matter, the Supreme Court interpreted § 2259's statutory language to impose a general proximate-cause limitation. Id. at 448, 134 S. Ct. at

30

1721. The Supreme Court determined that "[r]estitution is therefore proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." Id. at 448, 134 S. Ct. at 1722.

The difficulty, the Supreme Court explained, comes in applying that causation requirement in a particular child pornography case. Id. at 449, 134 S. Ct. at 1722. This is so because of the "somewhat atypical causal process underlying the losses [a child pornography] victim claims." Id. The Supreme Court reasoned that it may be "simple enough" for a victim to prove the aggregate losses that stem from the ongoing traffic in her images as a whole. Id. Importantly, the Supreme Court observed that it is more difficult to determine "the 'full amount' of those general losses, if any, that are the proximate result of the offense conduct of a particular defendant who is one of thousands who have possessed and will in the future possess the victim's images but who has no other connection to the victim." Id.

Therefore, in child pornography possession offenses, the Paroline Court recognized that it would be virtually impossible to show that the defendant possessor was a but-for cause of any particular portion of the victim's losses "where the defendant is an anonymous possessor of images in wide circulation on the Internet." Id. at 450-51, 134 S. Ct. at 1722-23. Nevertheless, the Supreme Court observed that "[w]hile it is not possible to identify a discrete, readily

31

definable incremental loss [a defendant possessor] caused, it is indisputable that [the defendant possessor] was a part of the overall phenomenon that caused [the victim's] general losses." Id. at 456-57, 134 S. Ct. at 1726. And it would undermine the purposes of § 2259 to deny restitution in cases involving possessors of child pornography. Id. at 456-58, 134 S. Ct. at 1726-27.

The Supreme Court also recognized that the original abuse crime is compounded by the distribution and possession of images of the victim's original abuser's "horrific acts, which meant the wrongs inflicted on her were in effect repeated; for she knew her humiliation and hurt were and would be renewed into the future as an ever-increasing number of wrongdoers witnessed the crimes committed against her." Id. at 441, 134 S. Ct. at 1717. It does not matter that the victim does not know the name of the possessor because the losses do not flow from any specific knowledge of him; rather, the cause of the victim's losses "is the trade in her images." Id. at 456, 134 S. Ct at 1726. The Supreme Court also observed that "the victim suffers continuing and grievous harm as a result of her knowledge that a large, indeterminate number of individuals have viewed and will in the future view images of the sexual abuse she endured." Id. at 457, 134 S. Ct. at 1726. "In a sense, every viewing of child pornography is a repetition of the victim's abuse." Id. at 457, 134 S. Ct. at 1727. "The cause of the victim's general losses is the trade in her images." Id. at 456, 134 S. Ct. at 1726.

32

After rejecting a but-for test for proximate cause, the Paroline Court adopted a causation-in-fact standard for cases where: (1) "a defendant possessed a victim's images"; (2) "a victim has outstanding losses caused by the continuing traffic in those images"; and yet (3) "it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry." Id. at 458, 134 S. Ct. at 1727.  In that situation, the Supreme Court concluded that a defendant possessor of child pornography should be ordered to pay restitution "in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." Id.  The Supreme Court explained that the award "would not be severe" in a case where the possessor is only one of many thousands of offenders, but also would not be "a token or nominal amount." Id. at 458-59, 134 S. Ct. at 1727.  Rather, the required restitution would be "reasonable and circumscribed" and "suited to the relative size of [the defendant's] causal role." Id. at 459, 134 S. Ct. at 1727.

Further, the Supreme Court instructed, there is no "practical way to isolate some subset of the victim's general losses that [the possessor] Paroline's conduct alone would have been sufficient to cause." Id. at 451, 134 S. Ct. at 1723.  In Paroline, the defendant possessor was one of thousands who possessed the victim's images. Id. at 450, 134 S. Ct. at 1723.  The Supreme Court stressed that even though the victim does not know the possessor, the victim's "knowledge that her images

33

were circulated far and wide renewed the victim's trauma and made it difficult for her to recover from her abuse." Id. at 440, 134 S. Ct. at 1717. "While it is not possible to identify a discrete, readily definable incremental loss he [the possessor] caused, it is indisputable that he was a part of the overall phenomenon that caused her general losses." Id. at 456-57, 134 S. Ct. at 1726. In other words, the defendant possessor of the images caused in fact part of the general losses, even if "it is impossible to trace a particular amount of those losses to the individual defendant." Id. at 458, 134 S. Ct. at 1727.

The Paroline Court then turned to the question of how district courts are to determine the proper amount of restitution in these "possessor" cases. Id. As a general matter, the Supreme Court stated that a district court "must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." Id. at 459, 134 S. Ct. at 1727-28. The Supreme Court emphasized that this "cannot be a precise mathematical inquiry," but rather involves the exercise of "wide discretion" and "sound judgment" of the sort district courts typically exercise in the context of criminal sentencing and restitution more broadly. Id. at 459-62, 134 S. Ct. at 1728-29. The Supreme Court then expressly identified "a variety of factors district courts might consider" in determining a proper restitution amount for possession. Id. at 459-60, 134 S. Ct. at 1728 (emphasis added).

34

As a starting point, the Supreme Court suggested that district courts "determine the amount of the victim's losses caused by the continuing traffic in the victim's images." Id. at 460, 134 S. Ct. at 1728 (emphasis added). Then, to determine the defendant possessor's relative role in causing those general losses, the district court could consider factors such as: (1) "the number of past criminal defendants found to have contributed to the victim's general losses"; (2) "reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses"; (3) "any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted)"; (4) "whether the defendant reproduced or distributed images of the victim"; (5) "whether the defendant had any connection to the initial production of the images"; (6) "how many images of the victim the defendant possessed"; and (7) "other facts relevant to the defendant's relative causal role." Id.

The Supreme Court reiterated that these factors should not be used as a "rigid formula," but should instead serve as "rough guideposts" in determining a restitution amount for the possessor criminal defendant. Id. The Supreme Court noted that "[t]his approach is not without its difficulties," as it "involves discretion and estimation," but "courts can only do their best to apply the statute as written in a workable manner." Id. at 462, 134 S. Ct. at 1729. The Supreme Court emphasized

35

that district courts regularly exercise wide discretion, and there was "no reason to believe they cannot apply th[is] causal standard . . . in a reasonable manner." Id.[4]

## VI. STANDARD OF REVIEW

We review de novo the legality of a restitution order, but review for clear error the factual findings underlying that order. United States v. McDaniel, 631 F.3d 1204, 1207 (11th Cir. 2011); see also United States v. Osman, 853 F.3d 1184, 1188 (11th Cir. 2017). We review the amount of the district court's restitution award only for an abuse of discretion. See United States v. Robertson, 493 F.3d 1322, 1330 (11th Cir. 2007); see also Paroline, 572 U.S. at 459, 134 S. Ct at 1727-28 (emphasizing that "determining the proper amount of restitution" involves "the use of discretion and sound judgment" on the part of the district court).

A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures, or makes clearly erroneous findings of fact. United States v. Jordan, 582 F.3d 1239, 1249 (11th Cir. 2009). The abuse of discretion standard recognizes that the district court has a range of choices, and this Court

---

[4]Three of the four dissenting justices were not so sure and complained that "[w]hen it comes to [the defendant's] crime—possession of two of [the victim's] images—it is not possible to do anything more than pick an arbitrary number" as "the amount of the loss sustained by a victim as a result of" the defendant's crime. Paroline, 572 U.S. at 463, 134 S. Ct. at 1730 (Roberts, C.J., dissenting). The fourth dissenter, Justice Sotomayor, would have embraced the victim's joint and several liability theory, holding each possessor liable for restitution in the full amount of the victim's losses. Id. at 473, 134 S. Ct. at 1735 (Sotomayor, J., dissenting).

will not reverse the district court's choice as long as its decision does not amount to a clear error of judgment.  Id.

Osman, our only published post-Paroline restitution decision to date, did not address how the abuse of discretion standard applies in assessing whether the district court adequately considered the Paroline factors and imposed a reasonable restitution award.  See generally Osman, 853 F.3d at 1189-92.  But Paroline itself provides some important clues.  In Paroline, the Supreme Court emphasized that determining the proper restitution amount "involves the use of discretion and sound judgment" in a manner akin to that exercised "in the wider context of criminal sentencing," and that the ultimate award must be "reasonable and circumscribed."  Paroline, 572 U.S. at 459, 134 S. Ct. at 1727-28; see also id. at 462, 134 S. Ct. at 1729 (explaining that "[d]istrict courts routinely exercise wide discretion . . . in sentencing as a general matter" and should likewise apply Paroline's causal standard "in a reasonable manner").  And to guide the district court's exercise of its discretion, the Paroline Court identified a number of factors district courts may consider in fashioning an appropriate restitution award.  Id. at 459-60, 134 S. Ct. at 1728.

Paroline thus established a framework not unlike the one we apply in assessing the reasonableness of a defendant's sentence, in which we look to see whether the district court appropriately exercised its sentencing discretion in light

37

of the 18 U.S.C. § 3553(a) factors.  See, e.g., Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007); United States v. Irey, 612 F.3d 1160, 1188-91 (11th Cir. 2010) (en banc).  In that § 3553(a) context, we evaluate whether the district court failed to consider relevant factors, improperly weighed the relevant factors, or considered improper factors, and ultimately assess whether, under the totality of the circumstances, the sentence is reasonable.  See Irey, 612 F.3d at 1189.  And we will vacate a sentence imposed by the district court only if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  Id. at 1190 (internal quotation marks omitted).

Additionally, in sentencing cases, we do not require district courts to make detailed findings or give a thorough explanation for the sentence it chose.  See id. at 1194-95.  Specifically, "[t]he district court need not state on the record that it has explicitly considered each factor and need not discuss each factor," United States v. Dorman, 488 F.3d 936, 938 (11th Cir. 2007), "so long as the record reflects the court's consideration of many of those factors," United States v. Carpenter, 803 F.3d 1224, 1232 (11th Cir. 2015).  "Rather, an acknowledgment by the district court that it has considered the defendant's arguments and the § 3553(a) factors will suffice."  Dorman, 488 F.3d at 938.

38

A similar approach makes sense here. As in the sentencing context, in evaluating child pornography restitution awards under Paroline, appellate courts must determine whether the district court appropriately exercised its broad discretion in light of the facts of the particular case and awarded restitution in an amount that comports with the particular defendant's conduct. See Paroline, 572 U.S. at 458-59, 462, 134 S. Ct. at 1727-29; Irey, 612 F.3d at 1190. And as in the sentencing context, a number of relevant factors guide the district court's exercise of its discretion. See Paroline, 572 U.S. at 459-60, 134 S. Ct. at 1728; Gall, 552 U.S. at 51, 128 S. Ct. at 597. Furthermore, the Supreme Court in Paroline indicated that the exercise of discretion at issue in child pornography restitution cases is similar to that exercised in criminal sentencing more generally. See Paroline, 572 U.S. at 459, 134 S. Ct. at 1727-28.

Accordingly, in reviewing child pornography restitution awards under Paroline, this Court should consider whether, in light of the Paroline factors, the district court arrived at a restitution amount that lies within the general range of reasonable restitution awards dictated by the facts of the case. See Irey, 612 F.3d at 1190. In doing so, this Court should give due deference to the district court's determination that the Paroline factors, on the whole, justify the restitution amount awarded and should not vacate an award unless left with the definite and firm conviction that the district court committed a clear error of judgment in setting the

award amount.  See id.; Gall, 552 U.S. at 51, 128 S. Ct. at 597.  Moreover, so long as the district court acknowledges that it has considered the Paroline factors and the defendant's arguments regarding restitution, we will not vacate a restitution award solely on the basis that the district court did not address each factor explicitly.  See Carpenter, 803 F.3d at 1232; Dorman, 488 F.3d at 938.

With these principles in mind, we turn now to Rothenberg's disaggregation argument, which is a legal challenge to the district court's restitution order that we review de novo.  Osman, 853 F.3d at 1188.

## VII. DISAGGREGATION

On appeal, Rothenberg first argues that, as to all nine victims, the district court failed to "disaggregate" their losses.  Rothenberg contends that Paroline requires district courts to engage in disaggregation at two levels: first, by disaggregating the portion of the victim's losses caused by the original abuse; and second, by disaggregating the losses caused by the defendant from those caused by other possessors or distributors.

Rothenberg asserts that the district court here failed at the first level by relying on total loss estimates for each victim that did not separate out and deduct the losses caused by the original abuser.  Because the expert reports did not disaggregate the losses caused by the original abuser from those caused by the distributors or possessors, Rothenberg contends that the district court was required

40

to conduct that separating out itself.  Rothenberg maintains that the district court also failed to disaggregate at the second level by failing to use the amounts of the prior restitution orders against other defendant possessors or distributors for the same victims as a guidepost for determining his relative level of culpability.

The government responds that nothing in Paroline requires district courts to engage in the sort of formal disaggregation Rothenberg envisions.  Rather, the government contends that Paroline simply requires that the district court consider the Paroline factors and exercise its discretion in determining the amount of a victim's losses caused by the instant defendant.  The government submits that the district court here complied with those requirements, explicitly stating it was not holding Rothenberg accountable for the original abuse or distribution of the victims' images and setting restitution amounts that "best approximat[ed] Rothenberg's relative role."

This Court has not yet addressed whether, in awarding restitution post-Paroline, district courts first must formally disaggregate a victim's losses between the original abuser, distributors, and subsequent possessors.  Several of our sister circuits, however, have grappled with that question, and the results are mixed.

## A.    Eighth and Fifth Circuits' Decisions

We start with the Eighth Circuit's decision in United States v. Bordman, 895 F.3d 1048, 1058-59 (8th Cir. 2018), cert. denied, 2019 WL 1886056 (U.S. Apr. 29,

41

2019), a restitution case involving a defendant convicted of only possessing child pornography.  In Bordman, the Eighth Circuit expressly held that a district court is not required to formally disaggregate categories of loss before ordering restitution, such as the loss caused by the initial abuser.  Id. at 1058-59.

In doing so, the Eighth Circuit affirmed the district court's $3,000 award of restitution to a victim where the district court considered multiple factors, including: (1) the 1/n method, which took into account the number of defendants (32) who had already paid the victim restitution plus 1 (the defendant Bordman), for a total of 33; (2) the child pornography being videos with two copies of the same video in different folders; and (3) the "very aggravating factor" of the nature of the video.  Id. at 1052-53, 1059.  The victim's losses included $91,900 in therapy, related expenses, and for a vocational assessment and counseling, legal costs of $10,187.13, and attorney's fees.  Id. at 1052.  At the sentencing hearing, the government took the sum of $95,295.71 ($91,900 plus one third of the attorney's fees) and divided it by 33 defendants, resulting in the sum of $2,887.75.  Id. at 1052-53.  One-third of the attorney's fees was used because this same attorney had represented three victims.  Id. at 1052.  The district court imposed a $3,000 restitution amount for the victim.  Id. at 1054.

On appeal, the defendant-possessor Bordman specifically claimed that "the district court abused its discretion by failing to disaggregate the harm caused by the

42

initial abuse from the harm that his later possession caused." Id. at 1058. In rejecting that claim, the Eighth Circuit reasoned that "one of the Paroline factors already accounts for disaggregation"—namely, "whether the defendant had any connection to the initial production of the images." Id. at 1059 (quoting Paroline, 572 U.S. at 460, 134 S. Ct. at 1728). The Eighth Circuit "decline[d] to transform" this disaggregation factor "from a 'rough guidepost' into a 'rigid formula.'" Id. (quoting Paroline, 572 U.S. at 460, 134 S. Ct. at 1728).

The Fifth Circuit also has rejected, under plain error review, a defendant's challenge to restitution awards that relied on psychological reports that "did not separate the losses caused by [the defendant possessor] from the losses caused by other abusers." United States v. Halverson, 897 F.3d 645, 654-55 n.4 (5th Cir. 2018). The Fifth Circuit reasoned that nothing in Paroline clearly required victims to present a new psychological report in each case that "disaggregates a defendant's conduct from all other possible sources of the victim's losses." Id. The Fifth Circuit approved the district court's use of a restitution method which awarded each victim (1) a base $5,000 amount of restitution, plus (2) an additional sum of $1,409 for each image of the victim that the defendant possessed because the district court discussed factors that bore on the relative significance of the defendant's conduct and the district court was not required to make findings as to all of the Paroline factors. Id. at 653-54.

43

## B.    Fourth and Seventh Circuits' Decisions

While not directly ruling on the initial-abuser-disaggregation issue, two other decisions of our sister circuits bear mentioning.  That is because both decisions, post-Paroline, (1) emphasized the district court's wide discretion inherent in determining the amount of restitution, (2) affirmed restitution awards under various methodologies against possessors of child pornography, and (3) refused to impose more structure beyond the Supreme Court's multi-factored test.  See United States v. Dillard, 891 F.3d 151, 160-62 (4th Cir. 2018) (noting that Paroline did not set any "evidentiary minimums" for establishing restitution, that "[p]ost-Paroline, our sister courts of appeals have approved of various methods of determining a restitution award," and that "[d]istrict courts have great discretion in selecting an appropriate methodology"); United States v. Sainz, 827 F.3d 602, 605-07 (7th Cir. 2016) (discussing the district court's ability to employ varying methodologies, including the 1/n method, to calculate a restitution amount under Paroline and stating that "the bottom line here is that the amount of the award is substantively reasonable").  We discuss Dillard and Sainz in detail, as they demonstrate not only how to apply the Paroline factors, but also a common-sense, practical approach to restitution for victims whose losses are caused by the continuing traffic in their child pornography images.

44

In the Fourth Circuit's <u>Dillard</u> decision, while the defendant was the initial abuser of one child victim, he also possessed images of other child victims with whom he had no contact. <u>Dillard</u>, 891 F.3d at 154. The district court denied all restitution to <u>the non-contact victims</u> because the record contained no evidence that the victims were aware Dillard had their images and no evidence connecting the non-contact victims' harm to Dillard. <u>Id.</u> at 156. In reversing, the Fourth Circuit explained <u>Paroline</u> disavowed any such requirements. <u>Id.</u> at 159-60. The Fourth Circuit held the "[g]overnment satisfied its burden of causation by the uncontested evidence that Dillard's offense conduct included the seven non-contact victims' images" and "that these victims have outstanding losses caused by the continuing traffic in those images." <u>Id.</u> at 160 (internal quotation marks omitted).

As to how to calculate those non-contact victims' losses caused by Dillard, the Fourth Circuit said the district court "'might, as a starting point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images'" and "'then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses.'" <u>Id.</u> at 160 (quoting <u>Paroline</u>, 572 U.S. at 460, 134 S. Ct. at 1728). The Fourth Circuit remanded for the district court to consider the <u>Paroline</u> factors and award at least some "non-nominal amount of restitution" for the losses of the non-contact victims whose images Dillard possessed. <u>Id.</u> at 161-62. Where it was

45

"uncontested that the individuals seeking restitution were Dillard's victims and had outstanding losses associated with the continued trade in their images, they were entitled by statute to some non-nominal amount of restitution." Id. at 161 (citing Paroline, 572 U.S. at 458-60, 134 S. Ct. at 1727-28).

Similarly, the Seventh Circuit's decision in Sainz stresses the district court's "considerable discretion in deciding the extent of a defendant's restitution" who possessed child pornography. Sainz, 827 F.3d at 605. The defendant Sainz possessed six images of the victim that had circulated widely on the internet, but had no role in creating or distributing them. Id. at 604. The victim had "incurred financial losses such as future lost earnings, attorney fees, and medical and psychiatric expenses" that totaled $1.1 million. Id. at 604, 605 n.1. On appeal, the defendant Sainz did not challenge that he must pay some amount of restitution but argued that the $8,387.43 amount he was ordered to pay was "disproportionate to his relative role in causing" the victim's losses. Id. at 604-05. Sainz also claimed "he was not a legal cause of [the victim's] harm because hundreds or thousands of others also possessed the images, so she would have been harmed by others even if he had never possessed the images of her." Id. at 604.

Using the 1/n method advocated for by the government, the district court divided the total loss of $1.1 million by 136 because defendant Sainz was the 136th offender who was prosecuted and ordered to pay restitution. See id. at 605. By

46

possessing and viewing the victim's images, Sainz had re-victimized her and made her feel that the abuse was continuing.  Id. at 604.

In finding no legal error or abuse of discretion in the $8,387.43 restitution award, the Seventh Circuit affirmed and reasoned: (1) that the Supreme Court in Paroline "avoided rigid or mechanical rules" and left the district courts with "considerable discretion"; (2) the amount of restitution for a possessor like Sainz "should be neither 'severe' nor a 'token or nominal amount'"; (3) Paroline does not require "district courts to consider in every case every factor mentioned" and the district court does "not err by not addressing every Paroline factor"[5]; and (4) the Paroline factors are permissive, not mandatory and provide "rough guideposts" that "district courts might consider in determining a proper amount of restitution."  Id. at 605-07 (internal quotation marks omitted).  The Seventh Circuit recognized that the 1/n method is not appropriate for all cases because, when n is "very small or very large, a more nuanced method may be required."  Id. at 607.  The Seventh Circuit concluded, however, that the application of the 1/n method to Sainz's case "resulted in a reasonable restitution order of $8,400 for an offender who possessed six images of the victim and indisputably contributed to her harm."  Id.

_____

[5]The Seventh Circuit explained some of the Paroline factors refer to information that may not be "reliably known," such as "the number of offenders likely to be convicted in the future or the broader numbers of offenders who were involved but are unlikely to be caught."  Sainz, 827 F.3d at 607.  The Seventh Circuit stated that "the Supreme Court made clear in Paroline that the difficulty of coming up with reasonable estimates for an indeterminate number of other offenders should not be a barrier to all compensation for victims of child pornography."  Id.

We acknowledge that the defendant Sainz did not ask the court to disaggregate the losses from the initial abuser. Nonetheless, the Seventh Circuit's decision is instructive because it emphasizes that (1) the district court has "considerable discretion," (2) the court's method of restitution calculation can vary from case to case depending on the facts, and (3) "the bottom line" is that the district court's award of $8,387.43 was "substantively reasonable" for the defendant possessor Sainz, even though there were hundreds of other possessors of the same victim's images. See id. at 604-607.

## C.     Ninth and Tenth Circuits' Decisions

In contrast to these decisions, the Ninth and Tenth Circuits have determined that district courts must engage in some level of disaggregation as to the harms caused by the original abuse versus the harms caused by later distributors and possessors before awarding restitution against a particular possessor of child pornography. See United States v. Galan, 804 F.3d 1287 (9th Cir. 2015); United States v. Dunn, 777 F.3d 1171 (10th Cir. 2015). But even those post-Paroline decisions are nuanced and do not adopt a rigid, mathematical rule in that regard. Furthermore, the facts of the Tenth Circuit's Dunn case are important to understand what the Tenth Circuit did or did not conclude in that case.

In Dunn, one victim sought restitution of $583,955, which represented her total losses minus the amount of restitution already received from other defendants.

48

See Dunn, 777 F.3d at 1174, 1179.  Because Dunn was a distributor of the images, the district court determined that "he should be held jointly and severally liable for the entirety of [the victim's] injuries." Id. at 1179.  The victim's total losses were $1,330,015, and the district court held Dunn responsible for $583,955 of those total losses as the amount not yet paid.  See id. at 1181.

In reversing, the Tenth Circuit emphasized that the district court held the defendant Dunn liable for all of the victim's unpaid losses, including those caused by the initial abuser, and erred by not assessing Dunn's individual relative role in the causal process underlying the victim's losses.  See id. at 1181.  The Tenth Circuit concluded: "[T]o the extent that the district court relied on an expert report that did not disaggregate [the harms caused by the original abuser], the district court's adoption of $1.3 million as the total measure of damages cannot stand." Id. at 1182.[6]  The disaggregation conclusion in Dunn must be read in the factual context of a reversal of a district court's ruling that a defendant was jointly and

---

[6]Though it has not addressed whether district courts must disaggregate, the First Circuit has held that a district court order comported with Paroline's framework where it "excluded past costs and based its award on an estimate of [the victim's] future therapy costs, occasioned by defendant's conduct." United States v. Rogers, 758 F.3d 37, 39 (1st Cir. 2014).  The district court also "limited the losses to general losses from 'continuing' traffic" in the victim's images and "distinguished the future therapy losses attributable to defendant from the harm resulting from other viewers and from [the victim's] therapy needs relating to [the original abuser]." Id.  The First Circuit commented that the district court's $3,150 restitution award "represent[ed] the cost of 18 therapy visits," but the district court "noted that 50 visits would also have been a reasonable conclusion." Id.  The mere fact that this type of formal disaggregation is permissible under Paroline, however, does not mean that it is required.

49

severally liable with all other defendants, including the abuser, for the entirety of the victim's $1,330,015 total losses, minus only what other defendants had already paid. We read Dunn as requiring disaggregation in that case because the defendant was held jointly and severally liable with the abuser for the entirety of the losses; we do not read Dunn as requiring disaggregation in each and every restitution case.

Unlike Dunn's recounting of the restitution facts, the Ninth Circuit's decision in Galan does not indicate the amounts of the victim's losses or even the restitution award at issue. Galan, 804 F.3d at 1288. Rather, Galan recounts only these two facts: (1) the defendant Galan was not the victim's original abuser, who "made images of his disgusting crimes against [the victim] over an extended period" of time; and (2) that abuse ended about 11 years before Galan possessed the images. See id.

In reversing, the Ninth Circuit went much further than the Tenth. The Ninth Circuit held "that in calculating the amount of restitution to be imposed upon a defendant who was convicted of distribution or possession of child pornography, the losses, including ongoing losses, caused by the original abuse of the victim should be disaggregated from the losses caused by the ongoing distribution and possession of images of that original abuse, to the extent possible." Id. at 1291. The Ninth Circuit concluded "that Galan should not be required to pay for losses caused by the original abuser's actions." Id. at 1290. The Ninth Circuit

50

determined, in effect, that some type of calculation should be made between original abusers on the one hand and the distributors and possessors on the other. See id. at 1288, 1290.

Importantly, however, the Ninth Circuit cautioned that it "express[ed] no opinion about what portion of the victim's ongoing loss should be attributable to an original abuser." Id. at 1291. It also did not instruct how the disaggregation calculation should be done, and it even added that "[i]f the ultimate apportionment is not scientifically precise, we can only say that precision is neither expected nor required." Id.

D.    Our Analysis

After careful review of Paroline, we conclude that a district court is not required to determine, calculate, or disaggregate the specific amount of loss caused by the original abuser-creator or distributor of child pornography before it can decide the amount of the victim's losses caused by the later defendant who possesses and views the images. Paroline requires no such disaggregation. Certainly, Paroline directed district courts to hold a defendant accountable only for his own individual conduct and set a restitution "amount that comports with the defendant's relative role" in causing the victim's general losses. See Paroline, 572 U.S. at 454-55, 458-59, 134 S. Ct. at 1725, 1727. How a district court arrives at that figure is largely up to the district court, so long as the number is a "reasonable

51

and circumscribed award" that is "suited to the relative size" of the defendant's causal role in the entire chain of events that caused the victim's loss. Id. at 459, 134 S. Ct. at 1727.

In arriving at that figure, Paroline does require some consideration by the district court of whether the defendant possessor was also an abuser-creator or a distributor. See id. Indeed, that is why Paroline includes among its list of relevant factors "whether the defendant had any connection to the initial production of the images," and "whether the defendant reproduced or distributed images of the victim." Id. at 460, 134 S. Ct. at 1728. But those factors do not require that the district court make fact findings about the amount of losses caused by different groups of offenders.

To be clear, the district court should ensure that its restitution order relates only to the amount of harm and loss caused by the defendant possessor. But Paroline also repeatedly stresses the flexibility and broad discretion district courts have in arriving at such a reasonable restitution amount. See, e.g., id. at 459, 134 S. Ct. at 1727-28 ("[A] court must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses. This cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment."); id. at 459-60, 134 S. Ct. at 1728 ("[I]t is neither necessary nor appropriate to prescribe a precise

52

algorithm for determining the proper restitution amount at this point in the law's development. Doing so would unduly constrain the decisionmakers closest to the facts of any given case."); id. at 460, 134 S. Ct. at 1728 ("These factors need not be converted into a rigid formula . . . . They should rather serve as rough guideposts for determining an amount that fits the offense."); id. at 462, 134 S. Ct. at 1729 (stating, "the approach articulated above involves discretion and estimation," and "courts can only do their best to apply the statute as written in a workable manner").

Like the Eighth Circuit, we think it would be inconsistent with Paroline's flexible, discretionary framework to require district courts to perform an initial, formal step of calculating and then separately assigning a total loss amount to the initial abuser, then one to the distributors and possessors generally, and only then one to the particular defendant possessor. Rather, even if a victim's total loss estimate includes losses caused both by the original abuser-creator, the distributors, and other possessors, the district court need only indicate in some manner that it has considered that the instant defendant is a possessor, and not the initial abuser or a distributor, and has assigned restitution based solely on the defendant possessor's particular conduct and relative role in causing those losses. See id. at 458-62, 134 S. Ct. at 1727-29.

53

Here, the district court did exactly that.  In its restitution order, the district court explicitly found up front that "there is no evidence with respect to any victim that [Rothenberg] reproduced or distributed images of the victim or that he had [a] connection to the initial production of the images."  The district court expressly stated that it had "taken these factors into consideration in assigning [Rothenberg] a relative role as the proximate cause of these victims' losses."  And in setting each individual award, the district court reiterated that Rothenberg "neither created nor distributed" the victim's image.  Under Paroline, that is enough.  We therefore reject Rothenberg's disaggregation argument.

Before concluding, we recognize that the Supreme Court in Paroline did note in dicta that "[c]omplications may arise in disaggregating losses sustained as a result of the initial physical abuse, but those questions may be set aside for present purposes."  Id. at 449, 134 S. Ct. at 1722.  We do not read this dicta, which is contained in a parenthetical, as requiring in any way that the district courts in possessor cases take on the job of determining the harm and loss caused by the initial abuser or the distributors.[7]  Rather, the district court's job is to determine the

_____

[7]We acknowledge that the Ninth Circuit concluded that the set-aside statement in this parenthetical meant the Supreme Court "plainly perceived a need for separation" of losses from the initial abuser and the later possessor defendants.  Galan, 804 F.3d at 1290.  However, we read the dicta in this parenthetical sentence not in isolation, but in the context surrounding it, which to us signals that in possessor cases a court is not required to delve into the special losses caused by the original abuser.  Rather, in possessor cases, the court is examining only the general losses caused by the continuing traffic in the pornographic images and awarding restitution that

54

defendant possessor's causal role in the general losses caused by his participation in the ongoing traffic in the victim's images.

We likewise reject Rothenberg's argument that the district court erred in creating restitution disparities between himself and other possessors by "impos[ing] restitution in amounts substantially above the average [for other possessors] without providing any explanation at all." We recognize that the Supreme Court in Paroline listed as a factor "the number of past criminal defendants found to have contributed to the victim's general losses" and noted that the government "could also inform district courts of restitution sought and ordered in other cases." See id. at 460, 462, 134 S. Ct. at 1728-29. However, the Supreme Court did not require district courts to dive into the facts of every past order and position their restitution findings in relation to those of other courts. See id. The district court is not required to say why it did not follow or disagreed with restitution orders as to the same victim imposed by other courts. Paroline requires no such fact findings or analysis. Rather, the number of past criminal defendants and their restitution amounts, even as to the same victim, are just one of many

comports with the defendant possessor's relative role as a possessor. In our view, nothing in Paroline requires disaggregation, and everything in Paroline suggests otherwise.

55

factors the district court considers generally without having to make mathematical calculations.[8] See id.

## VIII. SUFFICIENCY OF THE EVIDENCE

### A.    McGarity

Rothenberg's next argument concerns victims Sierra, Jane, Sarah, Vicky, Amy, and Casseaopeia.[9]  As to these six victims, Rothenberg argues that the district court erred in relying on loss estimates that were based on psychological evaluations conducted before his arrest and thus before these victims learned of his criminal possession offense, citing this Court's prior precedent in United States v. McGarity, 669 F.3d 1218 (11th Cir. 2012).  The government responds that the portion of McGarity on which Rothenberg relies was overruled by Paroline.

In McGarity, which was decided prior to Paroline, this Court concluded that a psychological evaluation performed before the defendant's arrest and prosecution could not show the harm to the victim.  669 F.3d at 1269.  More specifically, for proximate cause to exist in a child pornography case, "there must be a causal connection between the actions of the end-user and the harm suffered by the

---

[8]In this case, the government's submission and calculations used the 1/n method, but only as a starting point for the district court's exercise of discretion and then application of the Paroline factors.  While we affirm the thorough and multifactored process used in this case, we caution that the application of a strict 1/n approach, in which the only thing the district court does is divide the total loss amount by the total number of defendants who have been ordered to pay restitution, ordinarily will not meet the individualized assessment requirement of Paroline.

[9]On appeal, Rothenberg does not challenge the evidentiary basis for victim Pia's $5,000 restitution award.

victim." Id. The McGarity Court determined that, in that case, the government failed to provide any basis for determining "whether [the defendant's] possession of child pornography proximately caused any of [the victim's] harm," given the victim's psychological evaluation occurred before the defendant's arrest and prosecution. Id.

As such, the McGarity Court determined that the psychological evaluation could not show the harm caused to the victim by the particular defendant's conduct in that case. Id. at 1269-70 (citing with approval the Second Circuit's decision in United States v. Aumais, 656 F.3d 147, 154 (2d Cir. 2011), that remarked that the victim's psychological evaluation preceded the defendant's arrest, and thus it could not demonstrate the impact on the victim caused by that defendant). In other words, the McGarity Court concluded that to establish proximate cause, the government must show that the victim actually learned of the particular defendant's possession of her images. See id. at 1269-70.

We agree with the government that this aspect of McGarity was abrogated by Paroline. See United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc."). In requiring to show harm that the victim was aware of a particular defendant's conduct, the McGarity Court essentially required that

57

the government establish a direct, but-for causal link between some portion of the victim's losses and the specific defendant's offense. See McGarity, 669 F.3d at 1269-70. As discussed above, however, Paroline rejected exactly that sort of direct or but-for causation requirement in setting out its new standard. See Paroline, 572 U.S. at 450-59, 134 S. Ct. at 1722-28. In Paroline, the Supreme Court recognized that "it is not possible to prove that [a victim's] losses would be less (and by how much) but for one possessor's individual role in the large, loosely connected network through which her images circulate," nor is there "a practical way to isolate some subset of the victim's general losses that [the defendant's] conduct alone would have been sufficient to cause." Id. at 450-51, 134 S. Ct. at 1723. Nevertheless, the Supreme Court explained that "it is indisputable that [the defendant] was a part of the overall phenomenon that caused [the victim's] general losses." Id. at 457, 134 S. Ct. at 1726.

In Paroline, the Supreme Court thus held that, "[i]n this special context" where it is clear both that the defendant possessed images of the victim and that the victim has outstanding losses as a result of the traffic in her images, "but where it is impossible to trace a particular amount of those losses to the individual defendant," courts should order restitution "in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." Id. at 458, 134 S. Ct. at 1727. The Supreme Court held that the

government need not establish that some specific portion of the victim's losses were directly caused by the defendant possessor's conduct, as McGarity had required. See id.; McGarity, 669 F.3d at 1269. Rather, the government need establish only that the victim suffered losses from the traffic in her images and that the defendant contributed to those losses by possessing her images, regardless of whether the victim was specifically aware of the defendant's conduct. Paroline, 572 U.S. at 458, 134 S. Ct. at 1727; see also id. at 442, 450, 134 S. Ct at 1718, 1723 (noting that the parties "stipulated that the victim did not know who Paroline was and that none of her claimed losses flowed from any specific knowledge about him or his offense conduct," and the victim therefore could not show her losses "would have been any different but for Paroline's offense").

We therefore conclude that the portion of McGarity's holding requiring the government to show that a child pornography victim was aware of, and specifically harmed by, a particular defendant possessor's conduct was abrogated by Paroline. See Archer, 531 F.3d at 1352. Consequently, Rothenberg's challenge to the restitution awards for six victims—Sierra, Jane, Sarah, Vicky, Amy, and Casseaopeia—based on that portion of McGarity fails.[10]

---

[10] The government asserts that Rothenberg did not specifically raise this before-my-arrest argument in the district court, and it should be reviewed only for plain error. We need not decide that issue; regardless of the standard of review, this claim fails because Paroline overruled this part of McGarity and Paroline was decided before Rothenberg's offense.

59

## B.    Mya and Jenny

Next, as to victims Mya and Jenny, Rothenberg argues the government

failed to submit reliable or sufficient evidence of their losses because neither of

those victims had psychological or economic reports detailing their losses.  In

opposition, the government asserts that it need not submit expert reports to

establish a victim's losses and that the evidence presented in support of Mya's and

Jenny's restitution requests provided a sufficient basis for the district court's

awards.[11]

The government bears the burden of proving the restitution amount by a

preponderance of the evidence.  Osman, 853 F.3d at 1189.  The government must

do so "with evidence bearing sufficient indicia of reliability to support its probable

accuracy."  Id. (internal quotation marks omitted).  Nevertheless, because "the

determination of the restitution amount is by nature an inexact science," a district

court "may accept a reasonable estimate of the loss based on the evidence

presented."  Id. (internal quotation marks omitted).

---

[11]We disagree with the government's contention that Rothenberg did not preserve his challenge to Mya's and Jenny's restitution awards on the ground that they were not supported by competent evidence.  Accordingly, we review the factual findings underlying the district court's restitution orders as to Mya and Jenny for clear error, Osman, 853 F.3d at 1188, and the amount of their restitution awards for an abuse of discretion, see Robertson, 493 F.3d at 1330; see also Paroline, 572 U.S. at 462, 134 S. Ct at 1729 (recognizing that "[d]istrict courts routinely exercise wide discretion . . . in fashioning restitution orders").

1.    Mya

Regarding Mya, the district court did not clearly err in determining that

sufficient evidence supported Mya's restitution request.  One of Mya's counsel,

Carol Hepburn, submitted a signed declaration stating Mya needed therapy and/or

medical care.  Rothenberg faults the district court for accepting the "self-serving"

estimate provided by Mya's counsel that Mya's future medical costs would likely

exceed $100,000.  In her declaration, Hepburn explained that the $100,000

estimate was not just pulled out of thin air.  Rather, it was based on Hepburn's

experience representing eight other, similarly situated child pornography victims.

Indeed, the restitution exhibits presented to the district court show that Hepburn

represented or co-represented several of the other victims in this case—Sierra, Pia,

Sarah, and Vicky.  Considering Hepburn's demonstrated experience in this area, it

was not unreasonable for the district court to consider her estimate as reliable

evidence of Mya's likely future costs.  See id.

Furthermore, counsel Hepburn explained that Mya was part of the same

child pornography series as Pia.  Though a psychological evaluation was

unavailable for Mya at the time of the restitution hearing,[12] her co-victim Pia was

---

[12]In challenging Mya's and Jenny's awards, Rothenberg also argues that a victim must always supply an expert medical or psychological report to support her restitution request. Rothenberg cites no caselaw for this proposition, and nothing in either Paroline or our own precedent establishes such a rigid requirement.  See Osman, 853 F.3d at 1189 (requiring only that the government present evidence "bearing sufficient indicia of reliability").  Though such

61

able to submit a preliminary evaluation.  That evaluation indicated that, at a bare

minimum, Pia had estimated therapy costs of $81,900 and emphasized that this

estimate reflected "only the current, most critical needs" for Pia, who like Mya was

still a minor, and did not account for the full extent of her losses or the services she

would require over the course of her lifetime.  And notably, Rothenberg does not

challenge the evidentiary basis for Pia's restitution award in this case.  That Mya's

co-victim Pia had preliminary estimated costs of at least $81,900 is a further

indicator that counsel Hepburn's $100,000 total cost estimate for Mya was

reasonable and appropriately relied upon by the district court.  See id.  On this

record, we are not left with a definite and firm conviction that the district court was

mistaken in concluding that sufficient evidence supported Mya's restitution

request.  See Robertson, 493 F.3d at 1330.

Nor did the district court abuse its broad discretion in awarding Mya her

requested restitution amount of $5,000.  See id.  Here, the district court properly

identified Paroline as the correct legal standard for awarding restitution in child

pornography cases.  In setting the amount of Mya's restitution award, the district

court addressed several relevant Paroline factors, noting that: (1) Rothenberg

possessed one image of Mya; (2) no other defendant was yet ordered to pay

---

expert reports are undoubtedly helpful to district court's in fashioning a restitution award, they
are by no means the only way to establish a reasonable estimate of a victim's losses.

restitution to Mya; (3) Mya had estimated losses exceeding $100,000; and (4) Rothenberg neither created nor distributed Mya's images. Paroline, 572 U.S. at 460, 134 S. Ct. at 1728. In light of these factors, the district court determined that Mya's $5,000 restitution request was reasonable. Given the wide discretion afforded by Paroline to district courts in this context, we cannot say this determination was unreasonable. See id. at 462, 134 S. Ct. at 1729; Jordan, 582 F.3d at 1249.

    2.    Jenny

Based on the more limited record as to Jenny, we agree with Rothenberg that the district court clearly erred in determining there was sufficient evidence to support Jenny's $42,600 request. In support of her restitution request, Jenny's counsel submitted a restitution cover letter and a victim impact statement from Jenny. In the letter, Jenny's counsel requested restitution in the following amounts: (1) $12,500 to pay for psychological and economic reports; (2) $5,000 in attorney's fees related to her request in this case; (3) $100 in legal fees related to her request in this case; and (4) $25,000 for "the defendant's appropriate share of the general losses caused to Jenny."

Like Mya, at the time of the restitution hearing, Jenny was still in the process of obtaining expert reports documenting her total losses. Unlike Mya, however, Jenny's separate counsel did not provide any reasonable estimate of what

those total losses might be.  Indeed, counsel did not provide any estimate of what Jenny's total losses might be.  Rather, in asserting that $25,000 was Rothenberg's "appropriate share" of Jenny's losses, counsel relied on (1) a proposed statute that would set a minimum restitution award of $25,000 for possession of child pornography, and (2) Masha's law, 18 U.S.C. § 2255(a), which creates a civil cause of action for victims who suffered personal injury as a result of a child pornography offense and sets a liquidated damages amount of $150,000.

This evidence is sufficient to show that Jenny has incurred costs of $17,600—to pay for expert reports and legal fees—in connection with her restitution request in this case,[13] yet it is not sufficient to establish what proportion of Jenny's as-yet-undetermined total losses Rothenberg proximately caused. Jenny's counsel suggested that the $150,000 liquidated damages amount in Masha's Law represents a reasonable estimate by Congress of the minimum amount of total damages suffered by a child pornography victim.  But the damages available to a plaintiff in a civil lawsuit may be quite different from the concrete "costs incurred" for which § 2259 provides recompense.  See 18 U.S.C. § 2259(c)(2).  For example, a plaintiff in a civil damages suit under § 2255(a) may be able to recover for noneconomic losses, such as pain and suffering or mental

---

[13]We note that the $12,500 portion of those costs for psychological and economic reports would not necessarily be fully attributable to Rothenberg, as Jenny will, unfortunately but undoubtedly, need to use those reports in support of future requests against other defendants.

and emotional distress, that are not available in a restitution proceeding under § 2259.  See Doe v. Hesketh, 828 F.3d 159, 170 (3d Cir. 2016).  As such, we do not see that Masha's Law provides much guidance in the present context.

Similarly, Jenny's counsel's reliance on proposed legislation setting a minimum $25,000 restitution award for child pornography possession offenses also provides little to no guidance here.  While Congress certainly would be well within its rights to establish such a mandatory minimum restitution amount in these cases, it had not done so at the time of Rothenberg's restitution hearing.[14]  Thus, the district court was required to instead follow Paroline's framework, which requires an individualized assessment of each particular defendant's restitutionary liability based on his conduct and relative role in the causal process.  Paroline, 572 U.S. at 445, 458-59, 462, 134 S. Ct. at 1720, 1727-29.  Imposing a pre-set minimum amount of restitution based solely on the type of offense Rothenberg committed does not comply with Paroline's framework, and the government did not submit evidence from which the district court reasonably could have determined that $25,000 was Rothenberg's relative share of Jenny's losses.

---

[14]Congress recently passed, and the president signed, a different version of the bill Jenny's counsel referred to, but that version sets the minimum restitution amount much lower, at $3,000. See Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018).

65

It is indisputable that Jenny has suffered some, likely large amount of losses from the online traffic in her images. See id. at 457, 134 S. Ct. at 1726. It is also indisputable that Rothenberg, who possessed 34 images and 1 video of Jenny, is responsible for some, possibly significant amount of those losses. Id. But the government bears the burden of proving at least a reasonable estimate of that amount based on reliable evidence, and it has not satisfied that burden here. Osman, 853 F.3d at 1189. In the absence of competent evidence to support the award, the district court clearly erred in ordering Rothenberg to pay $42,600 in restitution to Jenny. See id.

We therefore vacate the district court's restitution award as to Jenny and remand for further proceedings consistent with this opinion. On remand, the district court should allow Jenny to supplement her restitution request with evidence of her losses. See 18 U.S.C. § 3664(d)(5) (allowing a victim to seek an amended restitution order if the victim discovers additional losses after sentencing). The district court should then determine, in light of all the available evidence and the Paroline factors, the portion of Jenny's losses for which Rothenberg is responsible. Paroline, 572 U.S. at 458-60, 134 S. Ct. at 1727-28.

## IX. CONCLUSION

For the foregoing reasons, we affirm the district court's restitution order as to victims Sierra, Jane, Pia, Mya, Sarah, Vicky, Amy, and Casseaopeia, and vacate and remand the district court's restitution order as to victim Jenny.

**AFFIRMED in part; VACATED and REMANDED in part.**