[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12710

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MOISES ABRAHAM SOTELO,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cr-60016-RAR-1

_____

_____

2                    Opinion of the Court                    21-12710

No. 22-10403

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MOISES ABRAHAM SOTELO,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cr-60016-RAR-1

_____

Before NEWSOM, LAGOA and WILSON, Circuit Judges.

LAGOA, Circuit Judge:

Moises Abraham Sotelo appeals his sentence of 121 months' imprisonment following his conviction for one count of receipt of material involving the sexual exploitation of minors. In a second appeal, consolidated in this decision, Sotelo appeals the district court's order awarding a total of $30,000 in restitution to seven victims. In his second appeal, we are asked whether the procedure for

determining restitution in child pornography cases has changed in light of recent amendments to 18 U.S.C. § 2259, the statute mandating that restitution. After careful review, and with the benefit of oral argument, we conclude that the procedure has not changed, and we affirm Sotelo's sentence and restitution.

## I.    FACTUAL AND PROCEDURAL HISTORY

### A.    Underlying Facts

In January 2021, a federal grand jury indicted Moises Sotelo for one count of receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1) ("Count One"), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) ("Count Two").

The parties stipulated that the following facts would have been proven beyond a reasonable doubt at trial. Law enforcement agents in the Federal Bureau of Investigation ("FBI") Miami Division received a request from the FBI Minneapolis Division to locate and interview an individual in southern Florida who was allegedly trading images of child pornography on the social media application, LiveMe. Moises Sotelo, using the profile name "piper954", moderated a group on LiveMe called, "$cashmoney's FAM." His profile page on LiveMe included the statement, "looking for girls down in fort lauderdale to be naughty with and ill give you something in return. hit me up if interested. welcome all pics and vids of hot girls." As moderator of the group, Sotelo had the ability to allow other members of the group to post links which he would authorize and share with the other members.

On April 26, 2020, Sotelo responded to an image posted of a clothed prepubescent minor with a request for more links. On October 22, 2020, law enforcement agents contacted Sotelo, who admitted that he used the profile "piper954" and consented to a voluntary interview at the FBI Miami Field Office. Sotelo further admitted to using the group on LiveMe to download videos and images of child pornography. A search of his cell phone revealed that between March 19, 2018, and October 19, 2020, Sotelo had received videos of children, some under the age of twelve years, engaged in sexual activity. According to the Presentence Investigation Report ("PSI"), 12,061 files were recovered on Sotelo's device involving the sexual exploitation of minors, including sadistic and masochistic material.

On May 20, 2021, Sotelo pled guilty to Count One through a plea agreement. Pursuant to that plea agreement, the United States agreed to seek dismissal of Count Two of the indictment after sentencing. The government also agreed to recommend an acceptance of responsibility reduction to Sotelo's sentencing guideline level applicable to his offense under the U.S. Sentencing Guidelines and a seven-year term of imprisonment.

## B.    Sentencing

Sotelo's PSI described the offense conduct in more detail but was consistent with the factual proffer. In particular, the PSI details the graphic nature of the 10,112 images and 1,949 videos retrieved from Sotelo's device. The PSI assigned Sotelo a base offense level of 22 under 18 U.S.C. § 2252(a)(2). Because the material found on

Sotelo's device involved a prepubescent minor or minor who had not attained the age of twelve years, the offense level was increased by two. Because the offense involved material that portrayed sadistic or masochistic conduct or sexual abuse of an infant or toddler, the offense level was then increased by four. And because the offense involved the use of a computer and involved 600 or more images, the offense level was increased by two and five respectively. After the additions, Sotelo had an offense level of 35. This offense level was reduced by three because Sotelo accepted responsibility and the government filed a motion in support stating that he assisted authorities in the investigation of his own misconduct. The final offense level was calculated at 32.

The PSI assigned Sotelo one criminal history point for convictions on driving under the influence and driving with a suspended license in 2012. Two more points were added because he committed the instant offense while on probation. Thus, Sotelo had a criminal history category of II. Based on a criminal history category of II and a total offense level of 32, the PSI calculated a guideline sentencing range between 135 to 168 months' imprisonment. There were no objections to the PSI filed by Sotelo or the government.

On August 2, 2021, the district court conducted Sotelo's sentencing hearing. The district court first noted that the PSI indicated a total offense level of 32 and a criminal history category of II, bringing the advisory guideline range to 135 to 168 months. Then, both parties stated their views on the appropriate sentence. Sotelo

argued, with the government's agreement pursuant to the plea agreement, that 84 months or seven years imprisonment would be appropriate. The district court noted that the sentence would constitute a fifty-month downward variance and asked "why the Court should countenance, even by agreement, a variance, given some of the underlying circumstances of this case." In particular, the district court was concerned that Sotelo "had well over 600 images"—in fact, 156,287 images—and "many of those images depicted sadistic behavior as towards infants and toddlers."

The district court explained that Sotelo's three criminal history points for the DUI were "the driving force behind entertaining a variance in this case below the guidelines." The district court was clear that it did not believe the offense level was wrong. In fact, the district court "wholeheartedly agree[d] in this case that 135 to 168 is absolutely appropriate and not an overstatement." The court stated:

> It is because I think the history category is overstated. And when I combine that with the joint recommendation, those two factors are going to lead me to entertain a variance. But it will be a variance down to what he would have scored with a criminal history category of 1, which is still substantial.

> It's a 14-month variance, and I'm going to ultimately sentence him to the bottom of that revised guideline, which would be 121 months. I think, to me, that is sufficient. It's a little over the seven-year average, and I'm told in these cases it is closer to ten.

> He will ultimately be deported. It's still well below the guideline provisions, but, to me, the differen[ce] between seven and ten [years] in a case like this is driven by the specific facts that I just put on the record that the Court can not countenance a further variance, which would really go to the offense level, given the nature of the images, given that they are infants and toddlers, and given, again that I mentioned in passing, that he seemed to play a moderating role in the sharing of that pornography.

The district court thus sentenced Sotelo to a 121-month term of imprisonment followed by a 15-year term of supervised release.

Sotelo timely appealed his sentence.

### C.    Restitution

On November 29, 2021, the government filed a memorandum in support of restitution pursuant to the Mandatory Restitution for Sexual Exploitation of Children Act, 18 U.S.C. § 2259. Section 2259 mandates a minimum award of $3,000 per victim of child pornography, so long as that amount does not cause a victim to recover more than the full amount of their demonstrated losses. § 2259(b)(2). The government's memorandum described how the FBI submitted the child pornography found on Sotelo's device to the National Center for Missing and Exploited Children ("NCMEC")[1] to be reviewed for any known victims. NCMEC

---

[1] The NCMEC "is a private, non-profit 501(c)(3) corporation whose mission is to help find missing children, reduce child sexual exploitation, and prevent child victimization." *About Us*, NCMEC,

determined that Sotelo's device contained 1,712 images of known child pornography, 245 videos of known child pornography, and a total of 130 known series of images and videos. Some of the known series were titled "At School," "Best Necklace," "BluesPink," "Jenny," "Sweet Sugar," "Lighthouse," and "Pinkheart." Eight individual victims, who were depicted in the material found on Sotelo's device, submitted restitution requests to the district court. The victims were identified as "Maureen," "Pia," "Violet," "Maria," "Erika," "Tori," "Fiona," and "Jenny."[2] Each victim filed a claim under seal, and we discuss each claim in turn.

## Maureen

The government recommended $10,000 in restitution for Maureen. Her claim consisted of a restitution cover letter, psychological examination, victim impact statements, and an affidavit

---

https://www.missingkids.org/footer/about (last visited Feb. 26, 2025). The "NCMEC is statutorily obliged to operate the official national clearinghouse for information about missing and exploited children, to help law enforcement locate and recover missing and exploited children, to 'provide forensic technical assistance . . . to law enforcement' to help identify victims of child exploitation, to track and identify patterns of attempted child abductions for law enforcement purposes, to 'provide training . . . to law enforcement agencies in identifying and locating non-compliant sex offenders,' and . . . to operate the CyberTipline as a means of combating Internet child sexual exploitation." *United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016) (quoting 42 U.S.C. § 5773(b)). Pursuant to 18 U.S.C. § 2258A, NCMEC is statutorily authorized to receive and review images of child pornography to assist in the identification of child victims as well as assist in the prosecution of those crimes.

[2] These are pseudonyms to protect the victims' identities.

from Maureen's counsel detailing Maureen's future and current legal costs. The psychological examination report identified Maureen as the individual depicted in the "Lighthouse" series.

Maureen's abuser lived in her childhood home and would wake her almost every night to engage in sexual behavior from the time she was a young toddler to age eight. Following the end of her direct abuse, she was afraid to sleep and stated that her nightmares of her former abuser were so extreme that she could smell him in her dreams. When Maureen was in middle school, other students found out about her past and bullied her until she was forced to switch schools. And the knowledge of her abuse images being traded and viewed on the internet has continued the pain. Maureen said:

> You can't help wondering if people out there are looking. . . . That is why I don't go out very much. And when there are a lot of older men around, I get clammy and stressed out, and don't want to be alone. It is all tied to the downloaders.

When Victim Notification Services first notified Maureen that possessors of the materials depicting her abuse were being prosecuted, she did not want to receive the notices. Years later, she realized that the pursuit of restitution could be done right and she could "channel something good out of something bad," particularly to pay for therapy and counseling. She signed up for notifications and explained her experience:

> I went on the website that has the notices, and I started counting online the number of people there

are, just in my state—and I stopped.  It doesn't say where in the state that they are.  And you don't know if the people are released or not.  Once the number of notifications hit 200, I broke down.  I knew it was only going to get higher.  It feels permanent that these images are still being viewed and passed around.  It is always kind of there.

### Pia

The government recommended $5,000 in restitution for Pia.  Her claim consisted of a restitution cover letter, a psychological evaluation, a victim impact statement, employability analysis, and a declaration of attorney's fees.  The psychological examination report identified Pia as the individual depicted in the "Sweet Sugar" series.

Pia was abused by her father, who began showing her videos of sexually abused children when she was four years old to normalize the behavior.  For nearly two years, he sexually abused Pia daily.  In the wake of that abuse and with the knowledge of her images' circulation on the Internet, Pia is "uncommunicative, sleepy, sometimes tearful, [and] occasionally paralyzed" and "has asked to alter her features to change her appearance."  Her mother fears for her daughter's safety and wonders "if she is recognized by other pedophiles when we are out in public."

### Violet

The government recommended $10,000 in restitution for Violet.  Her claim consisted of a restitution cover letter, forensic

psychological examination, medical examination, and a declaration of attorney's fees. Her claim included a doctor's note acknowledging that Violet was the victim of "child sexual abuse with sexual exploitation from the production of digital abusive images."

Violet was mostly abused at night, and her abuser set up a camera and typed messages to others displayed on his computer monitor in between sex acts. Although Violet is too young to know about the dissemination of her abuse images, she is at risk of anxiety, fear, avoidance, distrust, grief, guilt, and hopelessness upon her eventual discovery.

## Maria

The government recommended $5,000 in restitution for Maria. Her claim consisted of counsel's declaration in support of restitution, which explained that they are in the process of compiling her restitution documentation and obtaining a psychological evaluation. The attorney also stated the treatment costs for other clients like Maria have been more than $100,000.00. The report identifies Maria as the victim in the "Best Necklace" series. Maria was ten years old at the time the videos of her abuse were produced and is still a minor today.

## Erika and Tori

The government recommended $3,000 in restitution for Erika and Tori each, for a total of $6,000. Their claims consisted of restitution cover letters, psychological evaluations, victim impact

statements, and declarations of attorney's fees. Their claims identified the two as the individuals depicted in the "Pinkheart" series.

Beginning at age five, Erika and Tori were sexually exploited by a relative to produce child pornography for several years. During their abuse, the perpetrator would take "requests" from online pedophiles in order to appeal to strangers' desires. Tori said that the "pictures out there make it so that I can't help but remember the things that I desperately want to erase," and that "I cannot escape the reality of those pictures, so I feel nothing." Tori lives an isolated life, but an expert who examined her stated:

> The internet is pervasive and necessary in order to gain access to almost everything: jobs, education, and social connections. If Tori is able to break out of her extremely isolated and limiting shell, she is bound to confront the disturbing realization that her childhood sexual abuse is no longer her own hidden secret, but a very public reality. This additional stress will most likely cause Tori further distress, despair, fear, and depression. One step forward will likely mean not just two, but three or four steps backwards for this otherwise fragile and struggling young woman.

### Fiona

The government recommended $3,000 in restitution for Fiona. Her claim consisted of a restitution cover letter, psychological evaluation, victim impact statement, and a declaration of attorney's fees. The attorney's cover letter described Fiona as the victim in the "BluesPink" series, and the psychological assessment

recognized that Fiona was "drugged, sexually abused, and had the images of that abuse posted on the internet." Fiona's abuse series is one of the most widely trafficked sets of child sex abuse images in the world.

Dr. Faller, one of the experts cited in the restitution claim, explained how child pornography possession harms victims for life:

> Unfortunately being a victim of child pornography is likely to have a negative effect on victims throughout the lifespan, not just on their ability to form positive personal relationships.

> First, as victims gain a more sophisticated under-standing of the violation of the taboo represented by the sexual abuse and the child pornography, they face renewed challenges in coping. Fiona, at this time, seems to have little comprehension of what her father did and the impact of the availability of the images of herself being sexually abused and exploited not just by her father but by a stranger. This comprehension will change as she grows older and likely will cause her significant ongoing trauma. . . .

> Second, victims of sexual abuse and child pornogra-phy essentially have fewer psychological resources for dealing with other adversities in life, such as the death of a caretaker, a car accident, loss of employment, or a divorce. Sexual abuse and being a victim of child pornography also literally compromises the immune system. . . .

Third, sexual abuse and being a victim of child pornography generates special problems as victims reach developmental milestones related to sexuality, intimacy, and close personal relationships. Typical milestones that create crises for victims are puberty, dating relationships, sexual encounters, marriage, decisions to have children, and when the victim's child or children reach the age when he or she was victimized.

### Jenny

The government recommended $3,000 in restitution for Jenny. Her claim consisted of a restitution cover letter, victim impact statement, psychological report, and a letter calculating the value of losses. Jenny's attorney stated that Jenny was the victim in the "Jenny" series.

Jenny's child abuse materials are some of the most widely trafficked in the world and are notorious for their graphic, sadomasochistic depictions, some involving animals. She was seven years old when her abuse began. Jenny was abused for two years before law enforcement found her on the internet and arrested her abuser. Now, she lives in fear of men and boys. She is always conscious of her clothing and ensures no one can see any parts of her. As to the dissemination of her graphic abuse, Jenny stated:

I worry about the pictures of me that are out there and I hate that others see them. I have feared over the years that someone would recognize me in public. I wish only that every single one can be found and destroyed someday.

★ ★ ★ ★

Altogether, the victims' restitution claims paint a vivid, painful picture of the harms caused by child sexual abuse and the possession of images depicting that abuse. While lives can be improved, the ongoing harm, inflicted by the illegal possession of these images, is seemingly impossible to end.

On January 4, 2022, the district court held a hearing on restitution. Sotelo objected to the government's determinations on restitution and argued that the district court was required to make a finding about the total approximate number of viewings of a victim's image in order to determine the defendant's relative role. Because the Amy, Vicky, and Andy Act (AVAA) amended § 2259, Sotelo urged the district court to depart from the multifactor analysis for child pornography restitution outlined in *Paroline v. United States*, 572 U.S. 434 (2014). The district court rejected this view, stating that the *Paroline* factors are still "good law" and would apply in this case.

Sotelo also argued that there had been "no identification" of the victims being in the series and such verification was absent from the record, which was necessary to establish restitution. Accordingly, the district court requested that the government file for the record the NCMEC report alluded to in the restitution request. The government agreed to do so, and explained how the NCMEC report verified the victims in the images and videos on Sotelo's device:

Repeatedly in case law and actually every case I read and every Supreme Court case, that is the burden the United States has put forward. It has been the [NCMEC] because those instances come from hash values.[3] That's how those images and videos—are identified. They're identified through hash values, and the [NCMEC] maintains those hash values. And from those hash values, they know that these particular series are the ones that are identified. And then those series are submitted to the—to the victims, the victims' attorneys, and they specify which victims we have in each series, and we know the restitution amounts they're requesting.

The government also stated that Sotelo's original attorney came to the FBI office and looked at the images individually. Following the restitution hearing, the government filed the NCMEC report as requested, as well as a corresponding spreadsheet created by law enforcement. Sotelo opposed reliance on those documents,

---

[3] A hash value is a sort of digital fingerprint. "Many companies rely on hash-value matching to remove child pornography from their email, file sharing, and similar internet services. A hash value is a number that is often represented as a sequence of characters and is produced by an algorithm based upon the digital contents of a drive, medium, or file. . . . Some algorithms assign a character to every pixel in an image, such that the hash value will change if a single pixel changes. After companies assign a hash value to a known image of child pornography, they can scan their services for files with the same value. When they get a match, they know that the scanned file is a duplicate of the child-pornography image without opening and viewing the file." *United States v. Miller*, 982 F.3d 412, 418-19 (6th Cir. 2020) (citations omitted and internal quotations omitted).

arguing that the person who prepared them was not identified, nor was there an explanation about how the information was obtained.

The NCMEC "compares images and identifies the children depicted within [child pornography]" and "then notifies an identified victim every time someone is arrested who is found to possess his or her image." *United States v. McDaniel*, 631 F.3d 1204, 1206 (11th Cir. 2011). Such a system responds to the reality of child pornography today. The internet provides offenders like Sotelo with unprecedented access to the possession and trade of child sexual abuse images and videos, often anonymously. It also allows individuals to connect with other offenders to facilitate the sharing of preexisting child sexual abuse material and to create incentives for the further production of new material. In this landscape, law enforcement faces a unique problem. The public must be prevented from possessing child pornography, but the material itself is often necessary to identify victims, who are sometimes in immediate danger. Thus, the NCMEC is statutorily mandated to serve as a national clearinghouse for child pornography reports and content in order to both prevent the further dissemination of illicit materials and to aid law enforcement in identifying victims for restitution and, often, rescue. *See* 18 U.S.C. § 2258A and 34 U.S.C.A. § 11293. As of July 2017, the NCMEC had received more than 21.7 million reports of child sexual exploitation and had assisted law enforcement in identifying more than 13,200 child victims.

Here, the NCMEC report identifies Sotelo's name, email addresses, and online screen name. It also contains the name of the

FBI agent who requested the report and the date it was requested. And it states that "[t]he following Child Identification Report lists the specific file name(s), the corresponding series name and the law enforcement point of contact who is providing age verification for the children." The report identified 130 child pornography series, inclusive of the seven series listed in the restitution claims. The attached spreadsheet lists the victims, the series in which their abuse was depicted, and the timestamps for their downloads onto Sotelo's device. The spreadsheet does not list its author nor the time of its creation.

On February 4, 2022, the district court entered the order on restitution. Before analyzing the issues directly, the district court outlined the AVAA and the burden of proof, noting that the government bears the burden of proving restitution by a preponderance of the evidence and that the evidence must bear sufficient indicia of reliability to support its probable accuracy. As to the NCMEC report and attached spreadsheet, the district court relied on our decision in *United States v. Hairston* for the proposition that a court may consider hearsay evidence in determining an award of restitution so long as the defendant has an opportunity to refute the evidence and it bears "minimal indicia of reliability." 888 F.2d 1349, 1353 (11th Cir. 1989) (quoting *United States v. Rodriguez*, 765 F.2d 1546, 1555 (11th Cir. 1985)). And the district court listed the

*Paroline*[4] factors, recognizing that they are "rough guideposts" and should not be treated as a "rigid formula."

The district court then addressed Sotelo's overarching objections to restitution. To start, the district court overruled Sotelo's objection to the use of the NCMEC report and spreadsheet. The district court was satisfied that the evidence had sufficient indicia of reliability to support its probable accuracy because it was compiled by law enforcement and an organization, the NCMEC, tasked with maintaining the database. The district court also noted that the evidence connects the images from Sotelo's computer, which were inspected by Sotelo's prior counsel, to the child victims identified by the NCMEC, and allowed the district court to ascertain when materials were accessed by Sotelo.

The district court also found that restitution was mandatory for each victim, as the government provided sufficient evidence "by way of the [NCMEC report] and [s]preadsheet, to identify each child victim found in the photo and video files on [Sotelo's] computer." The district court then turned to address the individual awards of restitution for each victim.

First, as to Maureen, based on the forensic psychological examination, witness impact statement, and affidavit detailing attorney's costs, the district court found that Maureen's total losses were between $185,528.18 and $205,128.18. Although Sotelo argued that § 2259 foreclosed any additional restitution because

---

[4] *See Paroline*, 572 U.S. at 458–61.

Maureen has already received enough in prior awards to cover the cost of her therapy, the district court disagreed, noting that § 2259 covers more than costs related to therapy. Because she has not recovered those costs, the court determined that she can still receive restitution. Turning to the *Paroline* factors, the district court noted the number of images (four images and one video) possessed by Sotelo, the amount of restitution previously collected ($187,528), and the fact that Sotelo did not produce the images. The district court then found that $3,000 was appropriate restitution for Maureen.

Next, as to Pia, based on the forensic psychological examination, witness impact statement, employability analysis, and affidavit detailing attorney's costs, the district court determined that Pia's total losses were between $1,073,919.44 and $1,710,919.44. The district court agreed with the government that lost income should include lost future earnings. Turning to the *Paroline* factors, the district court noted the number of images possessed by Sotelo (five images and eleven videos), the amount previously collected ($423,827.30), and the fact that Sotelo did not produce the images. The district court then found that $5,000 was appropriate restitution for Pia.

As to Violet, based on the forensic psychological examination, multiple studies addressing the psychological profiles of adult survivors of child exploitation, a letter from a doctor providing an estimated cost for medical treatments, other cases in which district courts have awarded victims like Violet restitution, and a

declaration detailing attorney's fees, the district court found that Violet's total losses were between $767,616.50 and $813,241.50. The district court noted that at minimum, Violet has incurred $47,409.50 in attorney's costs. The district court also noted that projected therapy and medical costs can be considered in calculating a victim's total loss. Because of the studies on the effects of child pornography abuse on victims in adulthood, the district court determined that the government showed, by a preponderance of the evidence, that it is more likely than not that Violet will need the projected therapy and medical treatments laid out by her doctors. Turning to the *Paroline* factors, the district court noted the number of images possessed by Sotelo (eighteen images and twelve videos), the amount previously collected ($226,228), and the fact that Sotelo did not produce the images. The district court also noted that Sotelo's causal role was greater with Violet than Maureen and Pia because of the higher number of images and videos on his device. Therefore, the district court found that $10,000 was appropriate restitution for Violet.

As to Maria, the district court first addressed whether a victim who does not know that her images are being trafficked can be awarded restitution under § 2259. The district court noted that therapy costs are not the only type of loss for which a victim may be compensated, citing attorney's fees. The district court also stated that Maria is undoubtedly a victim and the fact that she is unaware of her abuse's circulation does not preclude a finding of a reasonable expectation of the cost of future therapy. The district court reasoned that precluding Maria from receiving restitution

would "be inapposite to Congress' clear goal of providing victims of sexual abuse with substantial relief." Based on the victim's counsel's declaration in support of restitution, the district court found that Maria's total losses are $125,000. Turning to the *Paroline* factors, the district court noted the number of images possessed by Sotelo (three images and two videos), the amount previously collected ($0), the number of cases currently being prosecuted (hundreds), the percentage of total loss this restitution award would represent, and the fact that Sotelo did not produce the images. Thus, the district court found that $3,000 was appropriate restitution for Maria.

As to Tori, based on the letter detailing restitution from Tori's counsel, the approximate cost of the forensic examination needed in the case, and a report of the psychological consultation for Tori, the district court found that Tori's total losses are $20,500. The district court also noted that the losses are "almost certainly understated, as counsel for Tori is still in the process of obtaining the necessary documentation detailing her client's losses." Turning to the *Paroline* factors, the district court noted the number of images possessed by the defendant (two images), the amount previously collected ($18,078), and the fact that Sotelo did not produce the images. Finally, the district court found that $3,000 was appropriate restitution for Tori.[5]

---

[5] The government conceded that Erika was not pictured with Tori in the materials and that it no longer sought restitution for Erika.

21-12710                Opinion of the Court                23

As to Fiona, based on the letter detailing a restitution request, a victim impact statement from Fiona's mother, a report of psychological consultation, and a letter calculating certain losses for Fiona by an economics group, the district court determined that Fiona's total losses are at least $2,558,635. The district court declined to "opine on whether loss of enjoyment of life can be considered" because other metrics trigger the award for restitution. Turning to the *Paroline* factors, the district court considered the number of images Sotelo possessed (three images), the amount of prior restitution ($24,000), and the fact that Sotelo did not produce the images. Finally, the district court determined that $3,000 was appropriate restitution for Fiona.

Finally, as to Jenny, based on the letter detailing restitution from Jenny's counsel, a victim impact statement, a psychological assessment, and a letter calculating the value of certain losses by an economics group, the district court determined that Jenny's total losses are between $1,753,972 and $3,002,606. Turning to the *Paroline* factors, the district court noted the number of images Sotelo possessed (six images), the amount of prior restitution ($113,862), and the fact that Sotelo did not produce the images. Finally, the district court determined that $3,000 was appropriate restitution for Jenny.[6]

---

[6] The district court's order, by scrivener's error, listed the restitution for Jenny as "$3,0000," not "$3,000" as described in the body of the order and requested by the government.

Sotelo timely appealed the order of restitution.

## II.    STANDARD OF REVIEW

We review the substantive reasonableness of a sentence under the abuse of discretion standard. *United States v. Livesay*, 587 F.3d 1274, 1278 (11th Cir. 2009). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (quoting *United States v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006) (en banc)). In deciding on a sentence, the district court must evaluate all the 18 U.S.C. § 3553(a) factors, but the weight given to each factor is within the sound discretion of the district court. *United States v. Ramirez-Gonzalez*, 755 F.3d 1267, 1272 (11th Cir. 2014). The party challenging the sentence bears the burden of establishing that it is unreasonable based on the facts of the case and the § 3553(a) factors. *United States v. Shabazz*, 887 F.3d 1204, 1224 (11th Cir. 2018).

"We review *de novo* the legality of a restitution order, but review for clear error the factual findings underlying that order." *Rothenberg v. United States*, 923 F.3d 1309, 1327 (11th Cir. 2019). We review the amount of the district court's restitution award only for an abuse of discretion. *Id.; see also Paroline*, 572 U.S. at 459 (emphasizing that "determining the proper amount of restitution" involves "the use of discretion and sound judgment" by the district court). A district court abuses its discretion if it applies the

incorrect legal standard, follows improper procedures, or makes clearly erroneous findings of fact. *United States v. Jordan*, 582 F.3d 1239, 1249 (11th Cir. 2009).

### III.    ANALYSIS

### A.    Sentencing

As to his sentence, Sotelo argues that the district court abused its discretion by failing to properly consider and balance certain factors, including (1) his cooperation with authorities; (2) his deportation following his sentence; and (3) the government's comment that seven years was "usually" the sentence imposed in these cases.

Section 3553(a) provides that the district court "shall impose a sentence sufficient, but not greater than necessary," to accomplish multiple goals, including to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence to criminal conduct; and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)–(C). The court also must consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the guideline sentencing range; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been convicted of similar conduct; and the need to provide restitution to any victims. *Id.* § 3553(a)(1), (3)–(7).

Because we are reviewing for an abuse of discretion, we will not substitute our own judgment for that of the sentencing court

and will sometimes affirm the district court even if we would have sentenced the defendant differently in the first instance.  The question is whether the district court's decision was "'in the ballpark' of permissible outcomes."  *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (quoting *Ledford v. Peeples*, 605 F.3d 871, 922 (11th Cir. 2010)).  And when considering a claim of unwarranted sentencing disparity, we consider whether the defendant is similarly situated to the defendants to whom he compares himself. *United States v. Duperval*, 777 F.3d 1324, 1338 (11th Cir. 2015).  While we do not formally presume that a within-guidelines-range sentence is reasonable, "we ordinarily expect it to be."  *United States v. Castaneda*, 997 F.3d 1318, 1332 (11th Cir. 2021).  A district court's imposition of a sentence well below the statutory maximum penalty is another indicator of reasonableness.  *Id.*

Sotelo has not met the burden to show his sentence is substantively unreasonable.  As an initial matter, his 121-month sentence is already below the applicable advisory guideline of 135 to 168 months and substantially below the statutory maximum sentence of 240 months.  18 U.S.C. § 2252(b).  The record reflects that the district court considered Sotelo's deportation, Sotelo's cooperation, and the arguments around unwarranted sentencing disparities.  Despite these arguments, the district court determined that several factors weighed against a significant downward variance, including the number of images possessed, the fact that the images involved infants and toddlers and sadistic/masochistic behavior, and the fact that Sotelo played a moderator role.  The government's statement that seven years is the usual sentence in these

cases does not make the sentence unreasonable.  Neither the government nor Sotelo provided any further explanation or details about other "usual" cases, i.e., whether they involved toddlers, whether they involved defendants who played a moderator role, or whether they involved defendants who possessed a large number of images.  All of Sotelo's other arguments amount to a claim that the district court did not give proper weight to various factors in sentencing Sotelo.  The district court, however, weighed the factors and, in its broad discretion, came to a different conclusion, choosing a 14-month variance downward rather than Sotelo's request for a greater variance.  The final 121-month sentence fell significantly below the statutory maximum of 240 months and below the PSI's guideline range for the case, further indicating the sentence's reasonableness.  Thus, the sentence falls well within "the ballpark of permissible outcomes." *Rosales-Bruno*, 789 F.3d at 1257 (quoting *Irey*, 612 F.3d at 1189.)

Because we conclude that the district court did not abuse its considerable discretion in rejecting the parties' joint sentence recommendation and sentencing Sotelo to 121 months' imprisonment, we affirm Sotelo's sentence.

## B.    Restitution

As to restitution, Sotelo makes four arguments on appeal. First, Sotelo argues that the district court erred in relying on the NCMEC report and spreadsheet because there was no basis for finding that Sotelo possessed images of the listed victims and because the "minimal indicia of reliability" standard is incorrect post-

AVAA. Second, he claims that the district court erred in failing to present evidence on the total number of persons who had viewed each of the individual victim's images and making the requisite finding as to Sotelo's relative causal role. Third, he argues that the district court erred in awarding restitution where Violet, Maria, Tori, and Fiona have not been told their images are on the internet. Fourth, he argues that individual restitution amounts are not supported by the record for each individual victim. Before addressing these arguments, it is necessary to discuss the statutory scheme governing this kind of restitution.

"In a sense, every viewing of child pornography is a repetition of the victim's abuse." *Paroline*, 572 U.S. at 457. The collective conduct of every individual who possesses the depictions of a child's sexual abuse plays a role in continuing that original violation for the entire life of the victim. Recognizing this, Congress has mandated restitution in child pornography possession cases. *See* 18 U.S.C. § 2259. In *Paroline*, the Supreme Court adopted a causation-in-fact standard for § 2259 cases given that "[t]he cause of the victim's general losses is the trade in her images" and that "it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry." 572 U.S. at 449, 456–58. Such a system achieves two goals. It both helps victims achieve eventual restitution on the often long, painful, and expensive road to recovering from their abuse and conveys to offenders "the fact that child-pornography crimes, even simple possession, affects real victims." *Id.* at 459.

As to how district courts should determine the amount of restitution, the Supreme Court stated that a court "must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id.* While recognizing that the inquiry "cannot be a precise mathematical inquiry," the *Paroline* Court outlined factors that courts "might consider in determining a proper amount of restitution," stressing that "it is neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution at this point in the law's development." *Id.* at 459–60. These factors include: (1) the number of past criminal defendants found to have contributed to the victim's general losses; (2) reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; (3) any available and reasonably reliable estimate of the broader number of offenders involved; (4) whether the defendant reproduced or distributed images of the victim; (5) whether the defendant had any connection to the initial production of the images; (6) how many images of the victim the defendant possessed; and (7) other facts relevant to the defendant's relative causal role. *Id.* at 460. The Supreme Court cautioned that these factors are not a "rigid formula" but rather "guideposts" to aid the district court in determining restitution. *Id.*

The AVAA, effective December 7, 2018, amended § 2259. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018). The amendment provided the framework for determining restitution in child

pornography possession cases and set a minimum amount of $3,000 for restitution. *Id.* The amended § 2259 reads, in relevant part:

> (a) **In general**.—Notwithstanding [18 U.S.C.] section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under this chapter.
>
> (b) **Scope and nature of order**.—
>
> (1) **Directions**.—Except as provided in paragraph (2), the order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses.
>
> (2) **Restitution for trafficking in child pornography**.—If the defendant was convicted of trafficking in child pornography, the court shall order restitution under this section in an amount to be determined by the court as follows:
>
> (A) **Determining the full amount of a victim's losses**.—The court shall determine the full amount of the victim's losses that were incurred or are reasonably projected to be incurred by the victim as a result of the trafficking in child pornography depicting the victim.
>
> (B) **Determining a restitution amount**.—After completing the determination required under subparagraph (A), the court shall order restitution in an amount that reflects the

defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000.

(C) **Termination of payment**.—A victim's total aggregate recovery pursuant to this section shall not exceed the full amount of the victim's demonstrated losses.  After the victim has received restitution in the full amount of the victim's losses as measured by the greatest amount of such losses found in any case involving that victim that has resulted in a final restitution order under this section, the liability of each defendant who is or has been ordered to pay restitution for such losses to that victim shall be terminated.  The court may require the victim to provide information concerning the amount of restitution the victim has been paid in other cases for the same losses.

. . .

(c) **Definitions**.—

. . .

(2) **Full amount of the victim's losses**.—For purposes of this subsection, the term "full amount of the victim's losses" include any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim, and in the case of trafficking in child pornography offenses, as a proximate result of all trafficking in child

pornography offenses involving the same victim, including—

> (A) medical service relating to physical, psychiatric, or psychological care;
>
> (B) physical and occupational therapy or rehabilitation;
>
> (C) necessary transportation, temporary housing, and child care expenses;
>
> (D) lost income;
>
> (E) reasonable attorneys' fees, as well as other costs incurred; and
>
> (F) any other relevant losses incurred by the victim.

18 U.S.C. § 2259.

Thus, under § 2259, "[a] victim's total aggregate recovery . . . shall not exceed the full amount of the victim's demonstrated losses." § 2259(b)(2)(C). Accordingly, "[a]fter the victim has received restitution in the full amount of the victim's losses as measured by the greatest amount of such losses found in any case involving that victim that has resulted in a final restitution order . . . , the liability of each defendant who is or has been ordered to pay restitution for such losses to that victim shall be terminated." *Id.*

Prior to the AVAA amendments, § 2259 did not prescribe a minimum amount for restitution. In setting the minimum amount, Congress commented that "[i]t is the intent of Congress

that victims of child pornography be compensated for the harms resulting from every perpetrator who contributes to their anguish." AVAA, § 2, 132 Stat. at 4383. "Such an aggregate causation standard reflects the nature of child pornography and the unique ways that it actually harms victims." *Id.* Understanding the complexity of providing meaningful restitution to victims of a never-ending crime, we turn to Sotelo's arguments.

### 1.      *NCMEC Report and Spreadsheet*

On appeal, Sotelo argues that the district court erred in relying on the NCMEC report and spreadsheet. He contends that there was no basis for finding that Sotelo possessed the images and that the NCMEC report and spreadsheet lack the "minimal indicia of reliability" necessary to establish restitution. Particularly, Sotelo takes issue with the fact that the government did not disclose how the information in the spreadsheet was obtained nor who prepared the spreadsheet.

We conclude that the NCMEC report and spreadsheet bear the minimal indicia sufficient to establish reliability. Thus, the district court did not err in relying on those materials to establish and calculate restitution. In considering restitution, courts may consider hearsay evidence like the NCMEC report and spreadsheet so long as the defendant has an opportunity to refute the evidence and it bears the "minimal indicia of reliability." *Hairston*, 888 F.2d at 1353 (quoting *Rodriguez*, 765 F.2d at 1555). As an initial matter, we do not view the report and spreadsheet in a vacuum. Indeed, the names of the series and victims are consistent throughout the

record, including the report, spreadsheet, and the restitution claims. Further, the NCMEC report and spreadsheet's reliability is corroborated by more than 800 pages of documentation submitted by attorneys, doctors, economists, and psychologists with connections to the actual victims.

It is also notable that the report comes from the NCMEC, the only organization in the country dedicated to the notification and identification of child pornography victims. In the report, the NCMEC explains that the files submitted by the FBI Special Agent assigned to the case "were compared with NCMEC's Child Recognition & Identification System," that "[t]here were files that appear to contain child victims who have been identified by law enforcement," and that the report "will list the specific file names, the corresponding series name and the law enforcement point of contact who is providing age verification for the children." The government also outlined to the district court how the NCMEC retains hash values[7] on series and connects those values to individual victims. Finally, supporting the district court's finding that the report and spreadsheet were sufficiently reliable to establish restitution is the overarching fact that Sotelo pled guilty to possessing child pornography and acknowledged being the moderator of a group dedicated to trading images and videos of children being sexually abused, all in a timeframe that largely matches that in the spreadsheet.

---

[7] *See* footnote 3 supra.

These facts show that the NCMEC report and spreadsheet bear the minimal indicia of reliability, and thus we conclude that the district court did not abuse its discretion in relying on them. While it may have been better evidentiary practice for the government to obtain a signed declaration by someone at the NCMEC, or for the spreadsheet to include the name of the author or the time of creation, we will not conclude that this copious record was insufficient to establish restitution. In passing § 2259, "Congress was attempting to compensate the victims of child pornography, not to intensify the harm they have already suffered as a condition of obtaining restitution." *United States v. Kearney*, 672 F.3d 81, 99 (1st Cir. 2012). The evidence in this case sufficiently connected Sotelo's conduct to the individual victims' harms and, as Congress intended, did not overly burden victims with reminders of their abuse.

Sotelo also argues that the district erred in using the "minimal indicia of reliability" standard established in *Hairston*, 888 F.2d at 1353. Because the AVAA mandated a minimum restitution amount, Sotelo contends that the $3,000 minimum operates less as restitution and more as a fine or penalty, subject to a higher standard of proof pursuant to the rule from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013).

Because Sotelo made this argument for the first time on appeal, we review this issue only for plain error.[8] *United States v. Bobal*, 981 F.3d 971, 975 (11th Cir. 2020). "[W]here the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003). Neither the text of § 2259 nor any Supreme Court or Eleventh Circuit cases specifically address whether the AVAA's mandatory $3,000 is subject to *Apprendi*. Indeed, lacking any such precedent on which to rely, Sotelo argues in his brief *against* our previous decisions that suggest that *Apprendi* might not apply to the new mandatory restitution amount. *See Dohrmann v. United States*, 442 F.3d 1279, 1281 (11th Cir. 2006). Thus, the district court did not plainly err by applying the "minimal indicia of reliability" standard.[9] Because the district court did not plainly err, we need not reach the merits of the *Apprendi* question here.

---

[8] Indeed, Sotelo never cited *Apprendi* nor *Alleyne* in the restitution hearing or briefings and never argued that the restitution process violated his Fifth and Sixth Amendment rights to have restitution submitted to a jury.

[9] Sotelo also raises for the first time on appeal an Eighth Amendment argument that the prohibition of excessive fines precludes restitution of this size. For similar reasons, we find no plain error as to this issue. *See Bobal*, 981 F.3d at 975; *Lejarde-Rada*, 319 F.3d at 1291. And, in any event, a $3,000 minimum amount for restitution is not grossly disproportionate to the gravity of possessing child pornography. *Cf. United States v. Sperrazza*, 804 F.3d 1113, 1127 (11th Cir. 2015).

### 2.    Restitution Award

As to the actual award of restitution, Sotelo first argues that the district court erred by failing to determine how many people viewed each image.  Because the AVAA instructs district courts to determine the defendant's "relative role" in causing a victim's losses, Sotelo urges us to require the government to present evidence of the total number of viewers of a victim's images.

The text of the AVAA amended statute requires a court to order restitution that "reflects the defendant's relative role in the causal process that underlies the victim's losses."  § 2259(b)(2)(B).  Presenting evidence on the total number of viewers of a victim's images is neither a necessary finding to determine a defendant's relative role nor always possible given the sprawling nature of child pornography on the internet and the indeterminable number of potential viewers in the future.  The statutory language corresponds with the *Paroline* instructions for considering factors that can help determine, by no "rigid formula," the "defendant's relative causal role" in the victim's losses.  *Paroline*, 572 U.S. at 460.  As the Supreme Court stated, this inquiry "cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment."  *Id*. at 459.  The AVAA did not direct courts to depart from the established method of inquiry into a defendant's "relative role."  Indeed, that inquiry itself is now mandated by statute.  Far from displacing *Paroline*, the AVAA recognized the approach outlined in *Paroline* as the proper one in § 2259 cases, and Congress explicitly mentioned *Paroline* in its findings.  AVAA, § 2, 132 Stat. at 4383.

The district court thus did not abuse its discretion in not addressing each "rough guidepost" outlined in *Paroline*.

Next, Sotelo objects to the district court's award to Violet, Maria, Tori, and Fiona on the grounds that they have not yet been told that their abuse images are on the internet. Again, he is mistaken. Awareness of one's images being circulated on the internet is not a prerequisite for restitution, nor has Sotelo pointed to any case or authority suggesting otherwise. The language of § 2259 states that projected therapy and medical costs can be considered in calculating a victim's total losses. § 2259(b)(2)(A) ("The court shall determine the full amount of the victim's losses that were incurred or are *reasonably projected to be incurred* by the victim." (emphasis added)). And we have previously held that restitution for future expenses, such as future therapy and counseling, is allowed as long as the award reflects a reasonable estimate of those costs and is based on record evidence. *See United States v. Osman*, 853 F.3d 1184, 1189–90 (11th Cir. 2017). Moreover, the costs included in a victim's losses cover more than therapy, including medical services, transportation, temporary housing, lost income, and attorney's fees. 18 U.S.C. § 2259(c)(2). So even if a victim might forgo therapy, as Sotelo suggests, that by no means forecloses the reasonable projection of other costs. Indeed, the record overwhelmingly suggests that the widespread circulation of one's abuse images will cause harms to the victims throughout their lives. If the record supports a reasonable estimate of future costs to victims of child pornography who are currently unaware of the trafficked images,

no language in § 2259 nor case law prevents a district court from ordering restitution.

Finally, Sotelo attacks the restitution amounts, arguing that they were not supported by the record. When reviewing possession of child pornography restitution awards, we "give due deference to the district court's determination that the *Paroline* factors, on the whole, justify the restitution amount awarded and should not vacate an award unless left with the definite and firm conviction that the district court committed a clear error of judgment in setting the award amount." *Rothenberg*, 923 F.3d at 1328. In enacting § 2259, "it is clear that Congress intended to provide victims of sexual abuse with expansive relief for 'the *full* amount of . . . [their] losses' suffered as a result of abuse." *Osman*, 853 F.3d at 1192 (alterations in original) (quoting *United States v. Danser*, 270 F.3d 451, 455 (7th Cir. 2001)). The government bears the burden of proving "at least a reasonable estimate" of the losses "based on reliable evidence." *Rothenberg*, 923 F.3d at 1340. In showing restitution, the government has met that burden, and the district court did not abuse its discretion in awarding restitution.

As to Maureen's award for $3,000, the district court relied on the forensic psychological examination, witness impact statement, and affidavit detailing attorney's costs. Finding that Maureen's total losses were between $185,528.18 and $205,128.18, the district court concluded that Maureen's total loss was $205,128.18, relying on the higher end of the estimates in the attorney's and psychological reports. Sotelo argues that the district

erred and should have relied on the lower estimate, which would put Maureen's losses at the amount below the amount of restitution previously recovered, barring restitution. Sotelo does not, however, cite any authority showing that a district court has an obligation to choose the lower end of expert cost estimates. We also find no such authority. Given the extensive record outlining Maureen's incurred and projected costs, the district court did not abuse its discretion in awarding restitution to Maureen.

As to Pia's award for $5,000, the district court relied on the forensic psychological report, witness impact statement, employability analysis, and affidavit detailing attorney's costs. The district court found that Pia's total losses are between $1,073,919.44 and $1,710,919.44. Sotelo argues that the district court erred in relying on census data and comparison data from individuals not similarly situated to Pia to project future earnings losses. He also attempts to discredit Pia's future earnings by pointing out that she recently won an art award at school. Both arguments fail. First, the district court did not rely on census data, but rather relied on a vocational expert's analysis of the data and Pia's reasonably projected challenges in the future workplace. The professional hurdles of child abuse victims are well documented in the record. Second, Sotelo's highly selective focus on Pia's recent art award in school ignores the overwhelming message of the victim report that documents her depression, anxiety, social isolation, self-esteem issues, and concentration problems. Finally, Pia has been awarded similar restitution amounts in other cases before this Court. *See Rothenberg*, 923 F.3d at 1316–17; *United States v. Groover*, 2021 WL 3205719, at

*3, *5 (11th Cir. July 29, 2021). Thus, the district court did not abuse its discretion in its restitution award to Pia.

As to Violet's $10,000 restitution award, the district court relied on the forensic psychological examination, multiple studies addressing the psychological profiles of adult survivors of child exploitation, other cases in which district courts awarded victims like Violet restitution, and a declaration detailing attorney's fees and costs. The district court determined that Violet's total losses are between $767,616.50 and $813,241.50, which include losses projected to occur in the future. Noting the relatively large number of images possessed by Sotelo (eighteen images and twelve videos) and the evidence showing that it is more likely than not Violet will need the projected therapy and medical treatments laid out in the report, the district court deemed $10,000 appropriate restitution. The district court did not err in reaching that conclusion.

As to Maria's award for $3,000, the district court relied on her counsel's declaration in support of restitution, determining that Maria's total losses were $125,000. Sotelo argues that an attorney's letter alone is insufficient to establish restitution, but this argument asks us to go against established precedent. *Rothenberg*, 923 F.3d at 1337–38 (holding that a signed declaration from victim's counsel stating the projected costs of victim's future medical costs was sufficient evidence to support restitution). Again, the district court followed the inquiry set forth in *Paroline* and did not abuse its discretion in awarding Maria restitution.

As to Tori's award for $3,000, the district court relied on counsel's letter detailing the request, the approximate cost of the forensic examinations needed in the case, and a report of psychological consultation. The district court determined that Tori's losses totaled $20,500, noting that the current total is "almost certainly understated" given the early nature of her counsel's work on documenting her losses. Sotelo objects to this amount on appeal with arguments already addressed and rejected above. Given the reasonably projected costs and Sotelo's role in possessing and serving as a moderator in a child pornography group, the district court did not abuse its discretion in awarding Tori restitution.

As to Fiona's award for $3,000, the district court relied on the letter detailing restitution from Fiona's counsel, a victim impact statement by Fiona's mother, a report of psychological consultation, and a letter calculating the value of certain losses by an economics group. The district court determined that Fiona's total losses are at least $2,558,635. Sotelo argues that the AVAA did not contemplate restitution recoveries in the millions of dollars and criticizes the economic projection report and that the economic report inflated Fiona's costs. Even assuming the costs were inflated, the error in calculation would have to be nearly $2.5 million dollars to alter the district court's analysis given that Fiona has only received $24,000 in prior restitution so far. Since Fiona's costs are certainly above her current restitution received by at least $3,000, the district court did not abuse its discretion in awarding the minimum amount.

Finally, as to Jenny's award for $3,000, the district court relied on the letter from Jenny's counsel, her victim impact statement, psychological assessment, and a letter calculating losses by an economics group. The district court found that Jenny's total losses are between $1,753,972 and $3,002,606. Again, Sotelo argues that the lost future earnings are not reasonably projected. He also argues that Jenny's projected therapy costs are incorrect because she has elected not to undergo psychological therapy. The future earnings projection, however, was based on estimates by economists, and these kinds of costs are contemplated by the text of the statute, which includes restitution for "lost income" and "any other relevant losses incurred by the victim." 18 U.S.C. § 2259(c)(2)(D); *cf. Rothenberg*, 923 F.3d at 1331-32 (discussing *United States v. Sainz*, 827 F.3d 602 (7th Cir. 2016), which awarded restitution under § 2259 for future lost earnings). And an election not to pursue psychological treatment at this time does not foreclose other types of costs or even future treatment costs if it is more likely than not that she will eventually need treatment. It was not unreasonable to conclude that, through a lifetime of processing abuse and the circulation of the images of that abuse, treatment will more likely than not be necessary for Jenny. The district court thus did not abuse its discretion in awarding Jenny restitution.

In all, the district court's determinations on restitution were supported by a copious record and within a reasonable range of $3,000 to $10,000. "[C]hild pornography is 'a permanent record' of the depicted child abuses, and 'the harm to the child is exacerbated by [its] circulation.'" *Paroline*, 572 U.S. at 440. Sotelo possessed at

least 1,712 images and 245 videos of child pornography, and he was a moderator in an online group dedicated to the trade of such images.  Because we find no abuse of discretion in the district court's judgment, we affirm the district court's restitution award.

### IV.    CONCLUSION

For all these reasons, we affirm Sotelo's sentence and the order of restitution.

**AFFIRMED.**